RHIANNON G. O'DONNABHAIN, PETITIONER *v.* COMMISSIONER
OF INTERNAL REVENUE, RESPONDENT

Docket No. 6402–06.          Filed February 2, 2010.

In 1997, P, born a genetic male, was diagnosed with gender identity disorder, a condition recognized in medical reference texts, in which an individual experiences persistent psychological discomfort concerning his or her anatomical gender. Medical professionals who treat gender identity disorder prescribe for its treatment in genetic males, depending on the severity of the condition, (i) administration of feminizing hormones; (ii) living as a female in public; and (iii) after at least a year of living as a female, surgical modification of the genitals and, in some circumstances, breasts to resemble those of a female (sex reassignment surgery). Pursuant to this treatment regimen, P was prescribed feminizing hormones in 1997 and continued to take them through 2001. In 2000, after plastic surgery to feminize facial features, P began presenting full time in public as a female. In 2001 P underwent sex reassignment surgery, including breast augmentation surgery. P claimed a medical expense deduction under sec. 213, I.R.C., for the cost of the surgeries, transportation and other related expenses, and feminizing hormones, for the taxable year 2001. R disallowed the deduction. *Held*: P's gender identity disorder is a "disease" within the meaning of sec. 213(d)(1)(A) and (9)(B), I.R.C. *Held*, *further*, P's hormone therapy and sex reassignment surgery were "for the * * * treatment * * * of" and "[treated]" disease within the meaning of sec. 213(d)(1)(A) and (9)(B), I.R.C., respectively, and consequently the procedures are not "cosmetic surgery" that is excluded from the definition of "medical care" by sec. 213(d)(9)(A), I.R.C., and instead the amounts paid for the procedures are expenses for "medical care" that are deductible pursuant to sec. 213(a), I.R.C. *Held*, *further*, P's breast augmentation surgery was "directed at improving * * * [her] appearance" and she has not shown that the surgery either "meaningfully [promoted] the proper function of the body" or "[treated] * * * disease" within the meaning of sec. 213(d)(9)(B), I.R.C. Accordingly, the breast augmentation surgery is "cosmetic surgery" within the meaning of sec. 213(d)(9)(B), I.R.C., that is excluded from the definition of deductible "medical care" by sec. 213(d)(9)(A), I.R.C.

*Karen L. Loewy*, *Bennett H. Klein*, *Jennifer L. Levi*, *William E. Halmkin*, *David J. Nagle*, and *Amy E. Sheridan*, for petitioner.

*Mary P. Hamilton*, *John R. Mikalchus*, *Erika B. Cormier*, and *Molly H. Donohue*, for respondent.

34

GALE, *Judge*: Respondent determined a deficiency of $5,679 in petitioner's Federal income tax for 2001. After concessions,[1] the issue for decision is whether petitioner may deduct as a medical care expense under section 213[2] amounts paid in 2001 for hormone therapy, sex reassignment surgery, and breast augmentation surgery that petitioner contends were incurred in connection with a condition known as gender identity disorder.

### FINDINGS OF FACT

Many of the facts have been stipulated, and the stipulated facts and attached exhibits are incorporated in our findings by this reference. The parties have stipulated that this case is appealable to the U.S. Court of Appeals for the First Circuit.

I. *Petitioner's Background*

Rhiannon G. O'Donnabhain (petitioner) was born a genetic male with unambiguous male genitalia. However, she[3] was uncomfortable in the male gender role from childhood and first wore women's clothing secretly around age 10. Her discomfort regarding her gender intensified in adolescence, and she continued to dress in women's clothing secretly.

As an adult, petitioner earned a degree in civil engineering, served on active duty with the U.S. Coast Guard, found employment at an engineering firm, married, and fathered three children. However, her discomfort with her gender persisted. She felt that she was a female trapped in a male body, and she continued to secretly wear women's clothing.

Petitioner's marriage ended after more than 20 years. After separating from her spouse in 1992, petitioner's feelings that she wanted to be female intensified and grew more persistent.[4]

---

[1] Petitioner concedes that she is not entitled to any deduction for an individual retirement account contribution, and respondent concedes that petitioner is entitled to deduct $1,369.59 as medical expenses under sec. 213.

[2] Unless otherwise indicated, all section references are to the Internal Revenue Code of 1986, as amended and in effect in the year in issue, and all Rule references are to the Tax Court Rules of Practice and Procedure.

[3] Reflecting petitioner's preference, we use the feminine pronoun to refer to her throughout this Opinion.

[4] Petitioner and her spouse were divorced in 1996.

II. *Petitioner's Psychotherapy and Diagnosis*

By mid-1996 petitioner's discomfort with her male gender role and desire to be female intensified to the point that she sought out a psychotherapist to address them. After investigating referrals, petitioner contacted Diane Ellaborn (Ms. Ellaborn), a licensed independent clinical social worker (LICSW) and psychotherapist, and commenced psychotherapy sessions in August 1996.

Although not a medical doctor, Ms. Ellaborn had a master's degree in social work and as an LICSW was authorized under Massachusetts law to diagnose and treat psychiatric illnesses. She had specialized training in the diagnosis and treatment of gender-related disorders.

During petitioner's psychotherapy Ms. Ellaborn learned of petitioner's cross-dressing history and of her longstanding belief that she was really female despite her male body. Ms. Ellaborn observed that petitioner was very sad and anxious, had very low self-esteem, had limited social interactions, and was obsessed with issues concerning the incongruence between her perceived gender and her anatomical sex.

In early 1997, after approximately 20 weekly individual therapy sessions, Ms. Ellaborn's diagnosis was that petitioner was a transsexual suffering from severe gender identity disorder (GID), a condition listed in the Diagnostic and Statistical Manual of Mental Disorders (4th ed. 2000 text revision) (DSM–IV–TR), published by the American Psychiatric Association. The DSM–IV–TR states that a diagnosis of GID is indicated where an individual exhibits (1) a strong and persistent desire to be, or belief that he or she is, the other sex; (2) persistent discomfort with his or her anatomical sex, including a preoccupation with getting rid of primary or secondary sex characteristics; (3) an absence of any physical intersex (hermaphroditic) condition; and (4) clinically significant distress or impairment in social, occupational, or other important areas of functioning as a result of the discomfort arising from the perceived incongruence between anatomical sex and perceived gender identity.[5] See

[5] In reaching her diagnosis Ms. Ellaborn considered and ruled out other causes—so-called co-morbid conditions—of petitioner's symptoms, including psychosis, an earlier diagnosis of attention deficit/hyperactivity disorder, depression, and transvestic fetishism.

Transvestic fetishism "occurs in heterosexual (or bisexual) men for whom the cross-dressing behavior is for the purpose of sexual excitement. Aside from cross-dressing, most individuals

DSM–IV–TR at 581. Under the classification system of the DSM–IV–TR, a severity modifier—mild, moderate, or severe—may be added to any diagnosis.[6] The term "transsexualism" is currently used in the DSM–IV–TR to describe GID symptoms that are severe or profound.[7]

Both the DSM–IV–TR and its predecessor the DSM–IV contain the following "Cautionary Statement":

> The purpose of DSM–IV is to provide clear descriptions of diagnostic categories in order to enable clinicians and investigators to diagnose, communicate about, study, and treat people with various mental disorders. It is to be understood that inclusion here, for clinical and research purposes, of a diagnostic category * * * does not imply that the condition meets legal or other non-medical criteria for what constitutes mental disease, mental disorder, or mental disability. * * *

## III. *Treatment of GID*

The World Professional Association for Transgender Health (WPATH), formerly known as the Harry Benjamin International Gender Dysphoria Association, Inc., is an association of medical, surgical, and mental health professionals specializing in the understanding and treatment of GID.[8] WPATH publishes "Standards of Care" for the treatment of GID (hereinafter Benjamin standards of care or Benjamin standards). The Benjamin standards of care were originally

---

with Transvestic Fetishism do not have a history of childhood cross-gender behaviors." DSM–IV–TR at 580. Petitioner reported to Ms. Ellaborn that she cross-dressed in order to feel more feminine rather than for purposes of sexual arousal.

[6] A modifier of "severe" indicates that there are many more symptoms than those required to make the diagnosis, or several symptoms that are particularly severe are present, or the symptoms result in marked impairment in social and occupational functioning beyond the minimum threshold required for diagnosis. See DSM–IV–TR at 2.

[7] The GID diagnosis was labeled "transsexualism" when it first appeared in the third edition of the DSM published in 1980 (DSM–III). The fourth edition of the DSM, published in 1994 (DSM–IV), replaced the transsexualism diagnosis with GID and added the criterion for the diagnosis that the patient exhibit clinically significant distress or impairment in important areas of functioning. The DSM–IV underwent a text revision in 2000, resulting in the DSM–IV–TR, but there are no material differences in the DSM's treatment of GID as between the DSM–IV and DSM–IV–TR editions.

Notwithstanding the replacement of the transsexualism diagnosis with GID, the terms "transsexualism" and "transsexual" are still used generally in psychiatry to refer to severe or profound GID— or a sufferer thereof.

[8] Harry Benjamin, M.D. (1885–1986), was an endocrinologist who in conjunction with mental health professionals in New York did pioneering work in the study of transsexualism. The parties have stipulated that the term "gender dysphoria" was coined by Dr. Norman Fisk (Dr. Fisk) in 1973 to describe patients presenting with dissatisfaction and unhappiness with their anatomic and genetic sex and their assigned gender. The parties have further stipulated that, according to a 1974 article by Dr. Fisk, transsexualism represents the most extreme form of gender dysphoria.

approved in 1979 and have undergone six revisions through February 2001.

Summarized, the Benjamin standards of care prescribe a "triadic" treatment sequence for individuals diagnosed with GID consisting of (1) hormonal sex reassignment; i.e., the administration of cross-gender hormones to effect changes in physical appearance to more closely resemble the opposite sex;[9] (2) the "real-life" experience (wherein the individual undertakes a trial period of living full time in society as a member of the opposite sex); and (3) sex reassignment surgery, consisting of genital sex reassignment and/or nongenital sex reassignment, more fully described as follows:

Genital surgical sex reassignment refers to surgery of the genitalia and/or breasts performed for the purpose of altering the morphology in order to approximate the physical appearance of the genetically other esx [sic] in persons diagnosed as gender dysphoric. * * * Non-genital surgical sex reassignment refers to any and all other surgical procedures of non-genital, or non-breast, sites (nose, throat, chin, cheeks, hips, etc.) conducted for the purpose of effecting a more masculine appearance in a genetic female or for the purpose of effecting a more feminine appearance in a genetic male in the absence of identifiable pathology which would warrant such surgery regardless of the patient's genetic sex (facial injuries, hermaphroditism, etc.).

Under the Benjamin standards, an individual must have the recommendation of a licensed psychotherapist to obtain hormonal or surgical sex reassignment. Hormonal sex reassignment requires the recommendation of one psychotherapist and surgical sex reassignment requires the recommendations of two.[10] The recommending psychotherapist should have diagnostic evidence for transsexualism for a period of at least 2 years, independent of the patient's claims.

The Benjamin standards state that hormonal sex reassignment should precede surgical sex reassignment because the patient's degree of satisfaction with hormone therapy "may indicate or contraindicate later surgical sex reassignment."

---

[9] Both parties' experts agree that administration of cross-gender hormones in genetic males with GID also has a psychological effect, producing a sense of well-being and a "calming effect".

[10] To be qualified to recommend hormonal or surgical sex reassignment, a psychotherapist must have (1) a master's degree in clinical behavioral science, and at least one of the recommenders for surgical sex reassignment must have a doctoral degree in the field; (2) competence in psychotherapy as demonstrated by a State license to practice it; and (3) specialized competence in sex therapy and gender identity disorders as demonstrated by supervised clinical experience and continuing education.

The Benjamin standards further state that "Genital sex reassignment shall be preceded by a period of at least 12 months during which time the patient lives full-time in the social role of the genetically other sex." The standards provide that breast augmentation surgery may be performed as part of sex reassignment surgery for a male-to-female patient "if the physician prescribing hormones and the surgeon have documented that breast enlargement after undergoing hormone treatment for 18 months is not sufficient for comfort in the social gender role."

IV. *Ms. Ellaborn's Treatment Plan for Petitioner*

After diagnosing severe GID in petitioner in early 1997, Ms. Ellaborn administered a course of treatment that followed the Benjamin standards of care.[11]

A. *Petitioner's Hormone Treatments*

In February 1997 Ms. Ellaborn referred petitioner to an endocrinologist for feminizing hormone therapy, and petitioner commenced taking hormones in September 1997.[12] She remained on feminizing hormones continuously through the taxable year in issue (2001).[13]

After beginning hormone therapy petitioner told Ms. Ellaborn that she felt calmer and better emotionally and that she felt positive about her physical changes. Ms. Ellaborn viewed petitioner's positive reactions to hormone therapy as validation of the GID diagnosis.

Petitioner advised her former spouse and children of her GID diagnosis in 1997 and 1998, respectively.[14]

B. *Petitioner's "Real-Life" Experience*

In consultation with Ms. Ellaborn, petitioner decided to undertake the Benjamin standards' "real-life" experience; i.e., to present in public as female on a full-time basis in March

---

[11] Petitioner attended monthly individual therapy sessions throughout most of 1997.

[12] Petitioner was hesitant about starting hormones and changing her appearance too quickly. She was concerned about the impact on her children and coworkers. Petitioner's 16-year-old son was living with her at the time, and petitioner wished to postpone significant changes in her appearance until after her son had graduated from high school and begun college.

[13] Petitioner also commenced electrolysis treatments to remove body hair in September 1997 and continued them through 2005. The deductibility of the expenses related to electrolysis is not at issue.

[14] The children's reactions were characterized by embarrassment, anger, denial, and withdrawal.

2000. Petitioner legally changed her name from Robert Donovan to Rhiannon G. O'Donnabhain and arranged to have the gender designation on her driver's license changed, on the basis of her GID diagnosis.[15] She underwent surgery to feminize her facial features,[16] and with the cooperation of her employer commenced presenting as a female at work around April of that year. Petitioner informed Ms. Ellaborn that her transition at work went smoothly and that the "real-life" experience had been "incredibly easy". Ms. Ellaborn viewed petitioner's positive response to her "real-life" experience as further validation of the GID diagnosis.

C. *Petitioner's Sex Reassignment Surgery*

Petitioner's anxiety as a result of having male genitalia persisted,[17] however, and Ms. Ellaborn concluded that her prognosis without genital surgical sex reassignment (sex reassignment surgery) was poor, in that petitioner's anxiety over the lack of congruence between her perceived gender and her anatomical sex would continue in the absence of surgery and would impair her ability to function normally in society. In November 2000 Ms. Ellaborn wrote a referral letter to Dr. Toby Meltzer (Dr. Meltzer), a board-certified plastic and reconstructive surgeon, with over 10 years' experience specializing in sex reassignment surgery, to secure a place for petitioner on his waiting list.

After three additional therapy sessions with petitioner in mid-2001, Ms. Ellaborn concluded that petitioner had satisfied or exceeded all of the Benjamin standards' criteria for sex reassignment surgery, including time spent satisfactorily on feminizing hormones and in the "real-life" experience. In July 2001 Ms. Ellaborn wrote a second letter to Dr. Meltzer certifying petitioner's GID diagnosis and satisfaction of the

---

[15] Petitioner also carried with her a letter from Ms. Ellaborn explaining the GID diagnosis, to be used in the event she was confronted by authorities for using a sex-segregated facility such as a restroom or a changing room.

[16] Ms. Ellaborn had observed that, notwithstanding 18 months of hormone therapy, petitioner had distinctly male facial features which interfered with her "passing" as female. Ms. Ellaborn referred petitioner to a plastic surgeon who in March 2000 performed procedures designed to feminize petitioner's facial features, including a rhinoplasty (nose reshaping), a facelift, and a tracheal shave (reducing cartilage of the "Adam's apple"). Petitioner was dissatisfied with the initial results, and in December 2000 the surgeon performed further surgery to revise the effects of the earlier procedures. The surgeon also gave petitioner a Botox treatment at that time. The deductibility of the foregoing procedures is not at issue.

[17] In one instance, petitioner held a knife and had an urge to cut off her penis.

Benjamin standards' criteria for sex reassignment surgery, and formally recommending petitioner for the surgery. Another licensed psychotherapist with a doctoral degree in clinical psychology, Dr. Alex Coleman (Dr. Coleman), examined petitioner and provided a second recommendation for her sex reassignment surgery, as required by the Benjamin standards. Dr. Coleman's letter to Dr. Meltzer observed that petitioner "appears to have significant breast development secondary to hormone therapy".

Petitioner, anticipating the formal recommendations for her surgery, went for a consultation and examination by Dr. Meltzer in June 2001 at his offices in Portland, Oregon. Dr. Meltzer concluded that petitioner was a good candidate for sex reassignment surgery. Dr. Meltzer's notes of his physical examination of petitioner state: "Examination of her breasts reveal [sic] approximately B cup breasts with a very nice shape."

In mid-October 2001 petitioner returned to Portland, and she underwent sex reassignment surgery on October 19, 2001. The procedures that Dr. Meltzer carried out included surgical removal of the penis and testicles and creation of a vaginal space using genital skin and tissue. The procedures were designed to surgically reconfigure petitioner's male genitalia to create female genitalia both in appearance and in function, by reconstructing the penile glans into a neo-clitoris, making sexual arousal and intercourse possible.

Dr. Meltzer also performed breast augmentation surgery designed to make petitioner's breasts, which had experienced some development as a result of feminizing hormones, more closely resemble the breasts of a genetic female.

In May 2002 Dr. Meltzer performed followup surgery on petitioner to refine the appearance of her genitals and remove scar tissue. In February 2005 Dr. Meltzer performed further surgery on petitioner's face, designed to feminize her facial features. [18]

## V. *Petitioner's Claim for a Medical Expense Deduction*

During 2001 petitioner incurred and paid the following expenses (totaling $21,741) in connection with her hormone therapy, sex reassignment surgery, and breast augmentation

---

[18] The deductibility of these procedures undertaken in 2002 and 2005 is not at issue.

surgery: (1) $19,195 to Dr. Meltzer for surgical procedures, including $14,495 for vaginoplasty and other procedures, $4,500 for breast augmentation, and $200 towards a portion of petitioner's postsurgical stay at Dr. Meltzer's facility; (2) $60 for medical equipment; (3) $1,544 in travel and lodging costs away from home for presurgical consultation and surgery; (4) $300 to Ms. Ellaborn for therapy; (5) $260 for the consultation for a second referral letter for surgery; and (6) $382 for hormone therapy. These payments were not compensated for by insurance or otherwise.

On her Federal income tax return for 2001, petitioner claimed an itemized deduction for the foregoing expenditures as medical expenses, which respondent subsequently disallowed in a notice of deficiency.

## VI. *Expert Testimony*

### A. *Petitioner's Expert: Dr. Brown*

Petitioner's expert, Dr. George R. Brown (Dr. Brown), is a licensed physician, board certified in adult psychiatry by the American Board of Psychiatry and Neurology. Dr. Brown has been a member of the American Psychiatric Association since 1983 and was elected a Distinguished Fellow of that organization in 2003. At the time of trial Dr. Brown was a professor and associate chairman of the Department of Psychiatry at East Tennessee State University and chief of psychiatry at James H. Quillen Veterans Affairs Medical Center in Johnson City, Tennessee.

Dr. Brown has been an active member of WPATH since 1987, including serving on its board of directors, and he participated in the development of the Benjamin standards of care. He has seen approximately 500 GID patients either in a clinical setting or as an academic researcher. Dr. Brown has published numerous papers in peer-reviewed medical journals and written several book chapters on topics related to GID, including those in the Merck Manuals, one of the most widely used medical reference texts in the world.

Citing its recognition in the DSM–IV–TR, standard medical reference texts, and World Health Organization publications, Dr. Brown contends that there is general agreement in mainstream psychiatry that GID is a legitimate mental disorder. Dr. Brown indicates that there are no biological or laboratory

tests that may be used to diagnose GID but notes the same is true of virtually all of the mental disorders listed in the DSM–IV–TR.

In Dr. Brown's view, proper medical treatment of a person diagnosed with GID includes extended psychotherapy and one or more of the triadic therapies in the Benjamin standards. Dr. Brown is not aware of any case in which psychotherapy alone was effective in treating severe GID. For individuals with severe GID, Dr. Brown believes completion of the entire triadic sequence, i.e., through sex reassignment surgery, is usually medically necessary to "cure or mitigate the distress and maladaption caused by GID."

In Dr. Brown's opinion, it is also important to the mental health of a male with severe GID to be able to "pass" convincingly in public as female—that is, to be perceived as female by members of the public. Failure to pass exacerbates the anxieties associated with GID. Passing includes the use of sex-segregated facilities such as restrooms and locker rooms, where a failure to pass can result in public humiliation, assault, or arrest. Genetic males with GID sometimes have distinctly male facial features that make it difficult to pass, absent surgery to feminize facial features.

According to Dr. Brown, autocastration, autopenectomy, and suicide have been reported in patients who did not receive appropriate treatment for their GID. Dr. Brown rejects the idea that sex reassignment surgery is comparable to cosmetic surgery or is undertaken to improve one's appearance, in view of the social stigma (including rejection by family and employment discrimination) and the pain and complications typically associated with such surgery. Moreover, Dr. Brown observes, normal genetic males generally do not desire to have their penis and testicles removed. Such a desire is regarded in the psychiatric literature as a likely manifestation of psychosis (usually schizophrenia) or GID, followed by a range of other less likely explanations. In Dr. Brown's opinion, people undergo sex reassignment surgery because of the severity of their GID symptoms and the lack of any other known effective treatment.

In Dr. Brown's view, the scientific literature demonstrates positive therapeutic outcomes from sex reassignment sur-

gery. He cites widely used psychiatric reference texts that reach the same conclusion.[19]

On the basis of a review of petitioner's medical records and a telephone interview with petitioner, Dr. Brown opined that petitioner was properly diagnosed with GID and petitioner's treatments, including sex reassignment surgery, were appropriate and medically necessary.

B. *Respondent's Expert: Dr. Schmidt*

Respondent's expert, Dr. Chester W. Schmidt, Jr. (Dr. Schmidt), is a licensed physician, board certified in psychiatry by the American Board of Psychiatry and Neurology, and a member of the American Psychiatric Association. At the time of trial Dr. Schmidt was a professor of psychiatry at the Johns Hopkins University School of Medicine, the chief medical director, Johns Hopkins Health Care, and chair of the medical board, Johns Hopkins Bayview Medical Center.

Dr. Schmidt cofounded the Sexual Behavior Consultation Unit of the Johns Hopkins Hospital, a clinical, teaching, and research program devoted to the evaluation and treatment of sexual disorders, in 1971. Since that time he has been active in the clinical and teaching aspects of transsexualism, having participated in the evaluation of approximately 12 patients per year diagnosed with GID. However, he has not directly treated or managed a patient with GID since the mid-1980s, and his current clinical activity consists of evaluating new cases of GID. Dr. Schmidt's expert report states that he has "participated in the publication" of several peer-reviewed medical journal articles about GID, but none has been identified for which he was a listed author, and he has never written a chapter on the subject in a medical reference text.

In his expert report, Dr. Schmidt asserts that the validity of the GID diagnosis remains the subject of debate within the psychiatric profession and that he currently is undecided about its validity.[20] However, 10 months before submitting

---

[19] See Green, "Gender Identity Disorder in Adults", in New Oxford Textbook of Psychiatry 915 (Gelder, et al., eds., Oxford Univ. Press 2000); Green & Blanchard, "Gender Identity Disorders", in Kaplan & Sadock's Comprehensive Textbook of Psychiatry 1660 (Sadock & Sadock, eds., 7th ed., Lippincott Williams & Wilkins 2000); Levine, "Sexual Disorders", in Psychiatry 1492 (Tasman, et al., eds., 2d ed., John Wiley & Sons 2005).

[20] Dr. Schmidt's report states that he is uncertain that GID is a mental disorder in the light of the heterogeneity of GID patients (in terms of presentation, personality, and motivation) and

his expert report, Dr. Schmidt provided a diagnosis of GID as an expert in a U.S. District Court proceeding and continued to make the diagnosis regularly through the time of trial, as do other practitioners at the Johns Hopkins sexual disorders clinic he cofounded. Further, Dr. Schmidt states that the GID diagnosis is taught to psychiatrists in training at his and other medical schools and is a condition with which they must be familiar.

Dr. Schmidt agreed that GID requires treatment. He has observed that "you can't walk around day after day being ambiguous about your gender identity. It will tear you apart psychologically". Dr. Schmidt likewise agreed that untreated GID in males can sometimes lead to autopenectomy, autocastration, and suicide.

Dr. Schmidt believes that the Benjamin standards of care are merely guidelines rather than true standards of care, in that they do not meet the legal threshold of a "community" standard, the departure from which would constitute malpractice. Dr. Schmidt further believes that the Benjamin standards enjoy only limited acceptance in American medicine generally. He is unaware, however, of any significant disagreement with the Benjamin standards within the psychiatric profession, other than a minority that considers sex reassignment surgery unethical. Dr. Schmidt agrees with the Benjamin standards' treatment protocols, with the exception that he believes psychotherapy should be mandatory rather than merely recommended for candidates for sex reassignment. All GID patients at the sexual disorders clinic where Dr. Schmidt practices are advised to become familiar with the Benjamin standards of care.

Dr. Schmidt believes that cross-gender hormone therapy and sex reassignment surgery have recognized medical and psychiatric benefits for persons suffering from GID, including reinforcement of an internal sense of consistency and balance in their gender identity. Dr. Schmidt has also expressed the view that once a genetic male with GID makes the decision to transition to a female identity, everything that reinforces the identity is helpful for psychological well-being. However, in his opinion a therapist should remain neutral regarding whether a patient should undergo hormone therapy or the

the lack of a scientifically supported etiology of the condition.

surgery because, Dr. Schmidt believes, there is insufficient scientific evidence of the procedures' efficacy in treating GID. A therapist should accordingly only take a position when there are contraindications to the procedures, in his opinion.

Given his view that failure to adhere to the Benjamin standards of care would not constitute malpractice and that a therapist should remain neutral regarding the administration of hormone therapy or sex reassignment surgery, Dr. Schmidt concludes that the procedures are elective and not medically necessary. He acknowledges, however, that the issue of the medical necessity of sex reassignment surgery is "contentious and variable within American medicine."

Finally, while noting that there is some evidence that GID may have a neurological cause, Dr. Schmidt believes that there is no conclusive scientific proof that GID is the result of a genetic or congenital abnormality.

### C. *Respondent's Expert: Dr. Dietz*

Respondent's expert, Dr. Park Dietz (Dr. Dietz), is a licensed physician and board certified in psychiatry by the American Board of Psychiatry and Neurology. Like Dr. Brown, he is a Distinguished Fellow of the American Psychiatric Association. At the time of trial Dr. Dietz was a clinical professor of psychiatry and behavioral sciences at the University of California at Los Angeles School of Medicine. Dr. Dietz' specialty is forensic psychiatry, and he has written approximately 100 professional publications, mostly on sexual, criminal, and antisocial behavior from the standpoint of forensic psychiatry, in peer-reviewed journals, reference text chapters, and other media. Dr. Dietz was recognized as an expert in forensic psychiatry. He was retained by respondent for the purpose of addressing the question of whether GID or transsexualism is a disease or illness.

It is Dr. Dietz' opinion that GID is a mental disorder, susceptible of a correct or incorrect diagnosis, but not a disease or an illness because it has not been shown to arise from a pathological process within the body—a necessary condition for a disease in Dr. Dietz' view.[21] While acknowledging that commentators on the subject have advanced at

---

[21] Dr. Dietz believes that "illness" is simply "the recognized presence of disease, usually as a result of the host experiencing signs or symptoms, but sometimes as a result of an incidental finding by a clinician or the observations of a third party."

least three possible "sufficient conditions" for the presence of disease (namely, discomfort, dysfunction, or pathology), Dr. Dietz considers pathology the appropriate sufficient condition. Thus, in Dr. Dietz' opinion, disease is defined as follows:

> To be a disease, a condition must arise as a result of a pathological process. It is not necessary that this process be fully known or understood, but it is necessary that the pathology occur within the individual and reflect abnormal structure or function of the body at the gross, microscopic, molecular, biochemical, or neuro-chemical levels. * * *

Citing the cautionary statement in the DSM–IV–TR (to the effect that inclusion of a condition in a diagnostic category of the DSM does not imply that the condition meets legal criteria for mental disease), Dr. Dietz asserts that the designation of a condition as a mental disorder in the DSM–IV–TR does not indicate that the condition is a disease. To be a disease, a mental disorder must have a demonstrated organic or biological origin in the individual, in his view.

Dr. Dietz testified that since qualification as a disease under his definition depends upon a demonstration of the condition's organic origins, a condition may be a disease but not known as such, pending scientific discoveries concerning its etiology. For example, panic disorder and obsessive-compulsive disorder are now understood to have an organic basis, but their etiology was only discovered as a result of laboratory advances within the last decade or so. Thus, both conditions are diseases under Dr. Dietz' definition, but would not have been recognized as such 20 years ago. Dr. Dietz confirmed that bulimia[22] is psychologically unhealthy but not a disease under his formulation because it has no demonstrated organic etiology. Dr. Dietz was unable to say whether anorexia[23] is a disease under his definition because he was unfamiliar with the current state of scientific knowledge of anorexia's etiology. In Dr. Dietz' view, post-traumatic stress disorder is not a disease as he defines the term, but an injury.

Dr. Dietz agrees that GID is sometimes associated with autopenectomy, autocastration, and suicide.

---

[22] As confirmed by Dr. Dietz, bulimia is a mental disorder characterized by binge eating followed by inappropriate compensatory behaviors to avoid weight gain, such as induced vomiting.

[23] As confirmed by Dr. Dietz, anorexia is a mental disorder in which an individual refuses to maintain a minimally normal body weight, is phobic regarding weight gain, and exhibits a disturbance in perception of the shape or size of his or her body.

OPINION

I. *Medical Expense Deductions Under Section 213*

A. *In General*

Section 213(a) allows a deduction for expenses paid during the taxable year for medical care that are not compensated for by insurance or otherwise and to the extent that such expenses exceed 7.5 percent of adjusted gross income.[24] In addition, section 213(d)(1)(B) and (2) provides that certain amounts paid for transportation and lodging, respectively, may qualify as amounts paid for medical care under section 213(a) if a taxpayer's travel away from home is primarily for and essential to receiving medical care.[25]

B. *Definition of Medical Care*

Congress first provided an income tax deduction for medical expenses in 1942. See Revenue Act of 1942, ch. 619, sec. 127(a), 56 Stat. 825. The original provision was codified as section 23(x) of the 1939 Internal Revenue Code and read as follows:

SEC. 23. DEDUCTIONS FROM GROSS INCOME.

In computing net income there shall be allowed as deductions:

* * * * * * *

(x) MEDICAL, DENTAL, ETC., EXPENSES.—Except as limited under paragraph (1) or (2), expenses paid during the taxable year * * * for medical care of the taxpayer * * *. The term "medical care", as used in this subsection, shall include amounts paid for the diagnosis, cure, mitigation, treatment, or prevention of disease, or for the purpose of affecting any structure or function of the body * * *.

At the time, the Senate Committee on Finance commented on the new deduction for medical expenses in relevant part as follows:

---

[24] Sec. 213(b) provides that amounts paid for a prescribed drug are treated as amounts paid for medical care. The parties have stipulated that the feminizing hormones petitioner purchased in 2001 were a prescribed drug within the meaning of sec. 213(b) and (d)(3), but respondent does not stipulate that the hormones were for the treatment of an illness or disease within the meaning of sec. 213.

[25] The parties have stipulated that if any part of petitioner's sex reassignment surgery is determined by the Court to be deductible under sec. 213, then petitioner's travel and lodging costs incurred in connection with her consultation and surgery by Dr. Meltzer are also deductible.

The term "medical care" is broadly defined to include amounts paid for the diagnosis, cure, mitigation, treatment, or prevention of disease, or for the purpose of affecting any structure or function of the body. It is not intended, however, that a deduction should be allowed for any expense that is not incurred primarily for the prevention or alleviation of *a physical or mental defect or illness*.

S. Rept. 1631, 77th Cong., 2d sess. 95–96 (1942), 1942–2 C.B. 504, 576–577 (emphasis added); see *Stringham v. Commissioner*, 12 T.C. 580, 583–584 (1949) (medical care is defined in broad and comprehensive language, but it does not include items which are primarily nondeductible personal living expenses), affd. 183 F.2d 579 (6th Cir. 1950).

The core definition of "medical care" originally set forth in section 23(x) of the 1939 Code has endured over time and is currently found in section 213(d)(1)(A), which provides as follows:

SEC. 213 (d). DEFINITIONS.—For purposes of this section—
(1) The term "medical care" means amounts paid—
(A) for the diagnosis, cure, mitigation, treatment, or prevention of disease, or for the purpose of affecting any structure or function of the body * * *

Thus, since the inception of the medical expense deduction, the definition of deductible "medical care" has had two prongs. The first prong covers amounts paid for the "diagnosis, cure, mitigation, treatment, or prevention of disease" and the second prong covers amounts paid "for the purpose of affecting any structure or function of the body".

The regulations interpreting the statutory definition of medical care echo the description of medical care in the Senate Finance Committee report accompanying the original enactment. The regulations state in relevant part:

(e) Definitions—(1) General. (i) The term "medical care" includes the diagnosis, cure, mitigation, treatment, or prevention of disease. Expenses paid for "medical care" shall include those paid for the purpose of affecting any structure or function of the body or for transportation primarily for and essential to medical care. * * *
(ii) * * * Deductions for expenditures for medical care allowable under section 213 will be confined strictly to expenses incurred primarily for the prevention or alleviation of *a physical or mental defect or illness*. * * *
[Sec. 1.213–1(e)(1), Income Tax Regs.; emphasis added.]

Notably, the regulations, mirroring the language of the Finance Committee report, treat "disease" as used in the

statute as synonymous with "a physical or mental defect or illness." The language equating "mental defect" with "disease" was in the first version of the regulations promulgated in 1943 and has stood unchanged since. See T.D. 5234, 1943 C.B. 119, 130. In addition, to qualify as "medical care" under the regulations, an expense must be incurred "primarily" for alleviation of a physical or mental defect, and the defect must be specific. "[A]n expenditure which is merely beneficial to the general health of an individual, such as an expenditure for a vacation, is not an expenditure for medical care." Sec. 1.213–1(e)(1)(ii), Income Tax Regs.

Given the reference to "mental defect" in the legislative history and the regulations, it has also long been settled that "disease" as used in section 213 can extend to mental disorders. See, e.g., *Fischer v. Commissioner*, 50 T.C. 164, 173 n.4 (1968) ("That mental disorders can be 'disease' within the meaning of [section 213(d)(1)(A)] is no longer open to question."); *Starrett v. Commissioner*, 41 T.C. 877 (1964); *Hendrick v. Commissioner*, 35 T.C. 1223 (1961).

In *Jacobs v. Commissioner*, 62 T.C. 813 (1974), this Court reviewed the legislative history of section 213 and synthesized the caselaw to arrive at a framework for analysis of disputes concerning medical expense deductions. Noting that the medical expense deduction essentially carves a limited exception out of the general rule of section 262 that "personal, living, or family expenses" are not deductible, the Court observed that a taxpayer seeking a deduction under section 213 must show: (1) "the present existence or imminent probability of a disease, defect or illness—mental or physical" and (2) a payment "for goods or services directly or proximately related to the diagnosis, cure, mitigation, treatment, or prevention of the disease or illness." *Id.* at 818. Moreover, where the expenditures are arguably not "wholly medical in nature" and may serve a personal as well as medical purpose, they must also pass a "but for" test: the taxpayer must "prove *both* that the expenditures were an essential element of the treatment *and* that they would not have otherwise been incurred for nonmedical reasons." *Id.* at 819. [26]

[26] Applying the foregoing principles, the Court in *Jacobs v. Commissioner*, 62 T.C. 813 (1974), concluded that the expenses of the taxpayer's divorce, even though the divorce was recommended by the taxpayer's psychiatrist and was beneficial to the taxpayer's mental health,

C. *Definition of Cosmetic Surgery*

The second prong of the statutory definition of "medical care", concerning amounts paid "for the purpose of affecting any structure or function of the body", was eventually adjudged too liberal by Congress. The Internal Revenue Service, relying on the second prong, had determined in two revenue rulings that deductions were allowed for amounts expended for cosmetic procedures (such as facelifts, hair transplants, and hair removal through electrolysis) because the procedures were found to affect a structure or function of the body within the meaning of section 213(d)(1)(A). See Rev. Rul. 82–111, 1982–1 C.B. 48 (hair transplants and hair removal); Rev. Rul. 76–332, 1976–2 C.B. 81 (facelifts); see also *Mattes v. Commissioner*, 77 T.C. 650 (1981) (hair transplants to treat premature baldness deductible under section 213).

In 1990 Congress responded to these rulings by amending section 213 to include new subsection (d)(9) which, generally speaking, excludes cosmetic surgery from the definition of deductible medical care. See Omnibus Budget Reconciliation Act of 1990, Pub. L. 101–508, sec. 11342(a), 104 Stat. 1388–471. A review of the legislative history of section 213(d)(9) shows that Congress deemed the amendment necessary to clarify that deductions for medical care do not include amounts paid for "an elective, purely cosmetic treatment". H. Conf. Rept. 101–964, at 1031 (1990), 1991–2 C.B. 560, 562; see also 136 Cong. Rec. 30485, 30570 (1990) (Senate Finance Committee report language on Omnibus Budget Reconciliation Act of 1990).[27]

---

were not deductible medical expenses because the divorce would have been undertaken even absent the taxpayer's depression.

[27] The bill as initially passed in the House of Representatives did not include a provision addressing cosmetic surgery; this provision originated in the Senate. The report of the Senate Finance Committee, which was informally printed in the Congressional Record, contrasted "cosmetic" procedures with "medically necessary procedures" as follows:

For purposes of the medical expense deduction, the IRS generally does not distinguish between procedures which are medically necessary and those which are purely cosmetic.

*        *        *        *        *        *        *

* * * Expenses for purely cosmetic procedures that are not medically necessary are, in essence, voluntary personal expenses, which like other personal expenditures (e.g., food and clothing) generally should not be deductible in computing taxable income.

*        *        *        *        *        *        *

Continued

Section 213(d)(9) defines "cosmetic surgery" as follows:

SEC. 213(d). DEFINITIONS.—For purposes of this section—

* * * * * * *

(9) COSMETIC SURGERY.—

(A) IN GENERAL.—The term "medical care" does not include cosmetic surgery or other similar procedures, unless the surgery or procedure is necessary to ameliorate a deformity arising from, or directly related to, a congenital abnormality, a personal injury resulting from an accident or trauma, or disfiguring disease.

(B) COSMETIC SURGERY DEFINED.—For purposes of this paragraph, the term "cosmetic surgery" means any procedure which is directed at improving the patient's appearance and does not meaningfully promote the proper function of the body or prevent or treat illness or disease.

In sum, section 213(d)(9)(A) provides the general rule that the term "medical care" does not include "cosmetic surgery" (as defined) unless the surgery is necessary to ameliorate deformities of various origins. Section 213(d)(9)(B) then defines "cosmetic surgery" as any procedure that is directed at improving the patient's appearance but excludes from the definition any procedure that "meaningfully [promotes] the proper function of the body" or "[prevents] or [treats] illness or disease". There appear to be no cases of precedential value interpreting the cosmetic surgery exclusion of section 213(d)(9).[28]

## II. *The Parties' Positions*

Respondent contends that petitioner's hormone therapy, sex reassignment surgery, and breast augmentation surgery are nondeductible "cosmetic surgery or other similar procedures"[29] under section 213(d)(9) because they were directed at improving petitioner's appearance and did not treat an illness or disease, meaningfully promote the proper function of the body, or ameliorate a deformity. Although respondent

---

* * * [U]nder the provision, procedures such as hair removal electrolysis, hair transplants, lyposuction [sic], and facelift operations generally are not deductible. In contrast, expenses for procedures that are medically necessary to promote the proper function of the body and only incidentally affect the patient's appearance or expenses for the treatment of a disfiguring condition arising from a congenital abnormality, personal injury or trauma, or disease (such as reconstructive surgery following removal of a malignancy) continue to be deductible * * *.

[28]*Al-Murshidi v. Commissioner*, T.C. Summary Opinion 2001–185, construed sec. 213(d)(9) but was decided under sec. 7463 and may not be treated as precedent. See sec. 7463(b).

[29]Respondent contends that petitioner's hormone therapy was a "similar procedure" within the meaning of sec. 213(d)(9)(A).

concedes that GID is a mental disorder, respondent contends, relying on the expert testimony of Dr. Dietz, that GID is not a disease for purposes of section 213 because it does not arise from an organic pathology within the human body that reflects "abnormal structure or function of the body at the gross, microscopic, molecular, biochemical, or neurochemical levels." Respondent further contends that the procedures at issue did not treat disease because there is no scientific proof of their efficacy in treating GID and that the procedures were cosmetic surgery because they were not medically necessary. Finally, respondent contends that petitioner did not have GID, that it was incorrectly diagnosed, and that therefore the procedures at issue did not treat a disease.

Petitioner maintains that she is entitled to deduct the cost of the procedures at issue on the grounds that GID is a well-recognized mental disorder in the psychiatric field that "falls squarely within the meaning of 'disease' because it causes serious, clinically significant distress and impairment of functioning." Since widely accepted standards of care pre-scribe hormone treatment, sex reassignment surgery, and, in appropriate circumstances, breast augmentation surgery for genetic males suffering from GID, expenditures for the fore-going constitute deductible "medical care" because a direct or proximate relationship exists between the expenditures and the "diagnosis, cure, mitigation, treatment, or prevention of disease", petitioner argues. Morever, petitioner contends, because the procedures at issue treated a "disease" as used in section 213, they are not "cosmetic surgery" as defined in that section.[30]

## III. *Analysis*

The availability of the medical expense deduction for the costs of hormonal and surgical sex reassignment for a transsexual individual presents an issue of first impression.

---

[30] Petitioner also argues that the expenditures for the procedures at issue are deductible be-cause they affected a structure or function of the body (within the meaning of sec. 213(d)(1)(A)) and were not "cosmetic surgery" under sec. 213(d)(9) because they were not "directed at improv-ing the patient's appearance" and because they "meaningfully [promoted] the proper function of the body" (within the meaning of sec. 213(d)(9)(B)). Given our conclusion, discussed herein-after, that the expenditures for petitioner's hormone therapy and sex reassignment surgery are deductible because they "[treated] * * * disease" within the meaning of sec. 213(d)(1)(A) and (9)(B), we need not resolve the foregoing issues with respect to those expenditures. We consider petitioner's arguments with respect to the breast augmentation surgery more fully *infra*.

A. *Statutory Definitions*

Determining whether sex reassignment procedures are deductible "medical care" or nondeductible "cosmetic surgery" starts with the meaning of "treatment" and "disease" as used in section 213. Both the statutory definition of "medical care" and the statute's exclusion of "cosmetic surgery" from that definition depend in part upon whether an expenditure or procedure is for "treatment" of "disease". Under section 213(d)(1)(A), if an expenditure is "for the * * * treatment * * * of disease", it is deductible "medical care"; under section 213(d)(9)(B), if a procedure "[treats] * * * disease", it is *not* "cosmetic surgery" that is excluded from the definition of "medical care".[31]

Because the only difference between the quoted phrases in these two subparagraphs is the use of the noun form "treatment" versus the verb form "treat", we see no meaningful distinction between them. "Code provisions generally are to be interpreted so congressional use of the same words indicates an intent to have the same meaning apply". *Elec. Arts, Inc. v. Commissioner*, 118 T.C. 226, 241 (2002); see also *Commissioner v. Keystone Consol. Indus., Inc.*, 508 U.S. 152, 159 (1993); *United States v. Olympic Radio & Television, Inc.*, 349 U.S. 232, 236 (1955); *Zuanich v. Commissioner*, 77 T.C. 428, 442–443 (1981). Consequently, the determination of whether something is a "treatment" of a "disease" is the same throughout section 213, whether for purposes of showing that an expenditure is for "medical care" under section 213(d)(1)(A) or that a procedure is not "cosmetic surgery" under section 213(d)(9)(B). A showing that a procedure constitutes "treatment" of a "disease" both precludes "cosmetic surgery" classification under section 213(d)(9) and qualifies the procedure as "medical care" under section 213(d)(1)(A).[32]

---

[31] As noted, respondent contends that petitioner's hormone therapy is a "similar procedure" within the meaning of the sec. 213(d)(9)(A) exclusion from "medical care" of "cosmetic surgery or other similar procedures". Respondent does not contend, however, that the hormone therapy's status as a "similar procedure" within the meaning of sec. 213(d)(9)(A) ipso facto causes the therapy to be excluded from "medical care". Instead, by arguing that the hormone therapy was directed at improving petitioner's appearance and did not treat an illness or disease, respondent concedes that a "similar procedure" as used in sec. 213(d)(9)(A) is delimited by the definition of "cosmetic surgery" in sec. 213(d)(9)(B)—that is, that a "similar procedure" is excluded from the definition of "medical care" if it "is directed at improving the patient's appearance and does not meaningfully promote the proper function of the body or prevent or treat illness or disease".

[32] The parties have stipulated that petitioner did not undertake hormone therapy or sex reassignment surgery to ameliorate a deformity arising from, or directly related to, a personal injury

Congress' reuse of the terms "treat" and "disease" in defining "cosmetic surgery" in section 213(d)(9)(B) triggers a second principle of statutory construction. Given that the phrase "treatment * * * of disease" as used in the section 213(d)(1)(A) definition of "medical care" had been the subject of considerable judicial and administrative construction when Congress incorporated the phrase into the definition of "cosmetic surgery" in 1990, it "had acquired a settled judicial and administrative interpretation". *Commissioner v. Keystone Consol. Indus., Inc.*, *supra* at 159. In these circumstances "it is proper to accept the already settled meaning of the phrase". *Id.* Therefore, the pre-1990 caselaw and regulations construing "treatment" and "disease" for purposes of the section 213(d)(1)(A) definition of "medical care" are applicable to the interpretation of those words as used in the section 213(d)(9)(B) definition of "cosmetic surgery".

B. *Is GID a "Disease"?*

Petitioner argues that she is entitled to deduct her expenditures for the procedures at issue because they were treatments for GID, a condition that she contends is a "disease" for purposes of section 213. Respondent maintains that petitioner's expenditures did not treat "disease" because GID is not a "disease" within the meaning of section 213. Central to his argument is respondent's contention that "disease" as used in section 213 has the meaning postulated by respondent's expert, Dr. Dietz; namely, "a condition * * * [arising] as a result of a pathological process * * * [occurring] within the individual and [reflecting] abnormal structure or function of the body at the gross, microscopic, molecular, biochemical, or neuro-chemical levels."

On brief respondent cites the foregoing definition from Dr. Dietz' expert report and urges it upon the Court as the meaning of "disease" as used in section 213; namely, that a "disease" for this purpose must have a demonstrated organic or physiological origin in the individual. Consequently, GID is

_____

arising from an accident or trauma, or a disfiguring disease. Petitioner has neither argued nor adduced evidence that the foregoing procedures ameliorated a deformity arising from, or directly related to, a congenital abnormality. See sec. 213(d)(9)(A). We consider petitioner's arguments concerning the breast augmentation surgery more fully *infra*.

not a "disease" because it has "no known organic pathology", respondent argues. [33]

However, this use of expert testimony to establish the meaning of a statutory term is generally improper. "[E]xpert testimony proffered solely to establish the meaning of a law is presumptively improper." *United States v. Prigmore*, 243 F.3d 1, 18 n.3 (1st Cir. 2001). The meaning of a statutory term is a pure question of law that is "exclusively the domain of the judge." *Nieves-Villanueva v. Soto-Rivera*, 133 F.3d 92, 99 (1st Cir. 1997); see also *United States v. Mikutowicz*, 365 F.3d 65, 73 (1st Cir. 2004); *Bammerlin v. Navistar Intl. Transp. Corp.*, 30 F.3d 898, 900 (7th Cir. 1994); *Snap-Drape, Inc. v. Commissioner*, 105 T.C. 16, 19–20 (1995), affd. 98 F.3d 194, 198 (5th Cir. 1996). Closely analogous is *S. Jersey Sand Co. v. Commissioner*, 30 T.C. 360, 364 (1958), affd. 267 F.2d 591 (3d Cir. 1959), where this Court refused to consider the expert testimony of a geologist concerning the meaning of the term "quartzite" as used in the Internal Revenue Code.

While the Court admitted Dr. Dietz' expert report and allowed him to testify over petitioner's objection, the use to which respondent now seeks to put his testimony is improper, and we disregard it for that purpose. [34] The meaning of "disease" as used in section 213 must be resolved by the Court, using settled principles of statutory construction, including reference to the Commissioner's interpretive regulations, the legislative history, and caselaw precedent. [35]

As a legal argument for the proper interpretation of "disease", respondent's position is meritless. Respondent cites no authority, other than Dr. Dietz' expert testimony, in support of his interpretation, and we have found none. To the contrary, respondent's interpretation is flatly contradicted by nearly a half century of caselaw. Numerous cases have treated mental disorders as "diseases" for purposes of section 213 without regard to any demonstrated organic or physiological origin or cause. See *Fay v. Commissioner*, 76 T.C. 408

---

[33] The experts all agree and the Court accepts, for purposes of deciding this case, that no organic or biological cause of GID has been demonstrated.

[34] In contrast, the testimony of the other two experts presents specialized medical knowledge concerning the nature of GID. These facts bear upon whether GID should be considered to qualify as a "disease", as the Court interprets that term.

[35] Dr. Dietz' testimony as a forensic psychiatrist is proper and useful regarding other matters, such as the state of knowledge concerning organic origins of mental conditions, and the Court relies on the testimony for certain other purposes, as discussed *infra*.

(1981); *Jacobs v. Commissioner*, 62 T.C. at 818; *Fischer v. Commissioner*, 50 T.C. 164 (1968); *Starrett v. Commissioner*, 41 T.C. 877 (1964); *Hendrick v. Commissioner*, 35 T.C. 1223 (1961); *Sims v. Commissioner*, T.C. Memo. 1979–499. These cases found mental conditions to be "diseases" where there was evidence that mental health professionals regarded the condition as creating a significant impairment to normal functioning and warranting treatment. This Court's discussion in *Fay v. Commissioner*, *supra* at 414–415, is representative:

While the record is not too clear with respect to the precise nature of the mental conditions of * * * [the taxpayer's children], we are satisfied that they both suffered from some sort of learning disability, accompanied by emotional stress, which prevented, or at least interfered with, their ability to cope in a normal academic environment. While this condition may or may not have been psychiatric, it was certainly a mental handicap or defect which we think may be considered a mental disease or defect for purposes of section 213. It was the type of disorder that the petitioners, their expert educational consultants, a psychiatrist, and the staff of the DLD program[36] thought could be mitigated or alleviated, or possibly cured, by the special attention and individual programing given to the children at the DLD. While these mental disorders may not have been severe enough to require psychiatric or psychological treatment, they were severe enough to prevent the children from acquiring a normal education without some help, and we think any treatment, whether rendered by medical people or specially trained educators, directly related to the alleviation of such mental disorders so that the recipient may obtain a normal, or more normal, education, qualifies as medical care under the statute.

In *Fischer v. Commissioner*, *supra* at 173–174, there was a similar absence of any discussion of organic or physiological origins in this Court's analysis of the "conventional meaning" of "disease".

The first question presented is whether petitioner's son, Don, was suffering from a "disease" as that term is used in the statute and the applicable regulation. Given that term its conventional meaning, we think the evidence is clear * * * that Don was suffering from a disease when he entered Oxford Academy. As detailed in our findings, the report of the Institute of the Pennsylvania Hospital states that as of that date Don had "not evolved the usual 'defense' or integrating mechanisms necessary for dealing maturely, realistically and in an organized fashion, with the problems of his environment. * * *"  * * * a psychiatrist who treated Don for

---

[36] The DLD program refers to the department of language development program, a special program at the taxpayer's children's school for children with learning disabilities. *Fay v. Commissioner*, 76 T.C. 408, 410 (1981).

almost a year, described him as a child with "significant neurotic blocks against learning." * * * [Fn. ref. omitted.]

See also *Jacobs v. Commissioner*, *supra* at 818 (taxpayer's "severe depression" as evidenced by his psychiatrist's testimony is "disease" for purposes of section 213); *Hendrick v. Commissioner*, *supra* at 1236 ("emotional insecurity" of child is a "disease" for purposes of section 213); *Sims v. Commissioner*, *supra* ("disease" for purposes of section 213 found although "record does not contain a precise characterization of * * * [the taxpayer's son's] condition in medical terminology, there is ample evidence to support a finding that he suffered from some sort of learning disability, accompanied by emotional or psychiatric problems"). We have also considered a condition's listing in a diagnostic reference text as grounds for treating the condition as a "disease", without inquiry into the condition's etiology. In *Starrett v. Commissioner*, *supra* at 878 & n.1, 880–882, a reviewed Opinion, we treated "anxiety reaction" as a "disease" for purposes of section 213, pointing to the condition's recognition in the American Medical Association's Standard Nomenclature of Diseases and Operations (5th ed. 1961).

The absence of any consideration of etiology in the caselaw is consistent with the legislative history and the regulations. Both treat "disease" as synonymous with "a physical or mental defect", which suggests a more colloquial sense of the term "disease" was intended than the narrower (and more rigorous) interpretation for which respondent contends.

In addition, in the context of mental disorders, it is virtually inconceivable that Congress could have intended to confine the coverage of section 213 to conditions with demonstrated organic origins when it enacted the provision in 1942, because physiological origins for mental disorders were not widely recognized at the time. As Dr. Dietz confirmed in his testimony, the physiological origins of various well-recognized mental disorders—for example, panic disorder and obsessive-compulsive disorder—were discovered only about a decade ago. Moreover, Dr. Dietz confirmed that bulimia would not constitute a "disease" under his definition, because bulimia has no demonstrated organic origin, nor would post-traumatic stress disorder. Dr. Dietz was unable to say whether anorexia would meet the definition because he was

uncertain regarding the current state of scientific knowledge of its origins. Petitioner's expert, Dr. Brown, testified without challenge that *most* mental disorders listed in the DSM–IV–TR do not have demonstrated organic causes. Thus, under the definition of "disease" respondent advances, many well-recognized mental disorders, perhaps most, would be excluded from coverage under section 213—a result clearly at odds with the intent of Congress (and the regulations) to provide deductions for the expenses of alleviating "mental defects" generally.

In sum, we reject respondent's interpretation of "disease" because it is incompatible with the stated intent of the regulations and legislative history to cover "mental defects" generally and is contradicted by a consistent line of cases finding "disease" in the case of mental disorders without regard to any demonstrated etiology.

Having rejected respondent's contention that "disease" as used in section 213 requires a demonstrated organic origin, we are left with the question whether the term should be interpreted to encompass GID. On this score, respondent, while conceding that GID is a mental disorder, argues that GID is "not a significant psychiatric disorder" but instead is a "social construction"—a "social phenomenon" that has been "medicalized". Petitioner argues that GID is a "disease" for purposes of section 213 because it is well recognized in mainstream psychiatric literature, including the DSM–IV–TR, as a legitimate mental disorder that "causes serious, clinically significant distress and impairment of functioning".

For the reasons already noted and those discussed below, we conclude that GID is a "disease" within the meaning of section 213. We start with the two caselaw factors influencing a finding of "disease" in the context of mental conditions: (1) A determination by a mental health professional that the condition created a significant impairment to normal functioning, warranting treatment, see *Fay v. Commissioner*, 76 T.C. 408 (1981); *Jacobs v. Commissioner*, 62 T.C. 813 (1974); *Fischer v. Commissioner*, 50 T.C. 164 (1968); *Hendrick v. Commissioner*, 35 T.C. 1223 (1961), or (2) a listing of the condition in a medical reference text, see *Starrett v. Commissioner*, 41 T.C. 877 (1964). Both factors involve deference by a court to the judgment of medical professionals.

As noted in our findings, GID is listed as a mental disorder in the DSM–IV–TR, which all three experts agree is the primary diagnostic tool of American psychiatry.[37] See also *Danaipour v. McLarey*, 286 F.3d 1, 17 (1st Cir. 2002) (characterizing the DSM–IV as "the leading psychiatric diagnostic manual"). GID or transsexualism is also listed in numerous medical reference texts, with descriptions of their characteristics that are similar to those in the DSM–IV–TR.[38] See *Starrett v. Commissioner*, *supra*.

Even if one accepts respondent's expert Dr. Schmidt's assertion that the validity of the GID diagnosis is subject to some debate in the psychiatric profession, the widespread recognition of the condition in medical literature persuades the Court that acceptance of the GID diagnosis is the prevailing view. Dr. Schmidt's own professed misgivings about the diagnosis are not persuasive, given that he continues to employ the diagnosis in practice, believes that psychiatrists must be familiar with it, and recently gave a GID diagnosis as an expert in another court proceeding.[39] On balance, the

_____

[37] We recognize that the DSM–IV–TR cautions that inclusion of a diagnostic category therein "does not imply that the condition meets legal or other non-medical criteria for what constitutes mental disease, mental disorder, or mental disability." For purposes of our decision in this case, GID's inclusion in the DSM–IV–TR (and its predecessors) evidences widespread recognition of the condition in the psychiatric profession. Indisputably, the issue of whether GID is a "disease" for purposes of sec. 213 is for this Court to decide, and we do so on the basis of a range of factors, including GID's inclusion in the DSM–IV–TR.

[38] See, e.g., American Medical Association, Complete Medical Encyclopedia 595, 1234 (Random House 2003); The Dictionary of Medical Terms 157 (4th ed. 2004); Dorland's Illustrated Medical Dictionary, http://www.mercksource.com/pp/us/cns__hl__dorlands; "Gender Identity Disorder and Transsexualism", Merck Manuals Online Medical Library, http://www.merck.com./mmpe/print/sec15/ch203/ch203b.html; Miller-Keane Encyclopedia and Dictionary of Medicine, Nursing, and Allied Health 728, 1808 (2003); National Institutes of Health, U.S. National Library of Medicine, MedlinePlus Medical Encyclopedia, http://nlm.nih.gov/medlineplus/ency/article/001527.html; Sloane-Dorland Annotated Medical-Legal Dictionary 202–203, 233, 291, 310, 744 (1987).

Transsexualism is also listed and described in the International Classification of Diseases, Ninth Revision, Clinical Modification (6th ed.) a publication of the American Medical Association used in the United States for assigning codes to various diagnoses and procedures. Similarly, various gender identity disorders, including transsexualism, are listed and described in the International Classification of Diseases, Tenth Revision, a 1992 publication of the World Health Organization that classifies diseases and health related problems.

Respondent stresses on brief that he stipulated that the foregoing publications were medical reference texts but did not stipulate the truth of their contents. Except where otherwise indicated, we consider medical reference texts solely for the fact that they recognize GID or transsexualism and treatments for the condition.

[39] Dr. Schmidt attributed his misgivings in part to the "lack of a scientifically supported etiology of the condition", but as petitioner's expert Dr. Brown pointed out, the same could be said of *most* mental disorders listed in the DSM.

evidence amply demonstrates that GID is a widely recognized and accepted diagnosis in the field of psychiatry.

Second, GID is a serious, psychologically debilitating condition. Respondent's characterization of the condition on brief as a "social construction" and "not a significant psychiatric disorder" is undermined by both of his own expert witnesses and the medical literature in evidence. All three expert witnesses agreed that, absent treatment, GID in genetic males is sometimes associated with autocastration, autopenectomy, and suicide. Respondent's expert Dr. Schmidt asserts that remaining ambiguous about gender identity "will tear you apart psychologically". Petitioner's expert Dr. Brown likewise testified that GID produces significant distress and maladaption. Psychiatric reference texts, established as reliable authority by Dr. Brown's testimony, confirm the foregoing. See Fed. R. Evid. 803(18). One such text states:

Cross-gender identity (gender identity contradicted by anatomical sex characteristics) in adulthood virtually always causes distress to the individual. * * * Cross-gender identity at any age, therefore, is appropriately regarded as a disorder and a possible reason for clinical intervention. * * * [Green & Blanchard, "Gender Identity Disorders", in Kaplan & Sadock's Comprehensive Textbook of Psychiatry 1646, 1659 (Sadock & Sadock, eds., 2000).]

Another psychiatric reference text states that "Prior to recognition of transsexualism as a disorder deserving medical and psychiatric attention many patients self-mutilated or committed suicide out of despair." Green, "Gender Identity Disorder in Adults", in New Oxford Textbook of Psychiatry 914 (Gelder, et al., eds., 2000).

Ms. Ellaborn concluded that petitioner exhibited clinically significant impairment from GID, to the extent that she designated petitioner's condition as "severe" under the DSM–IV–TR standards. Her diagnosis was supported by another doctoral-level mental health professional and by Dr. Brown. The severity of petitioner's impairment, coupled with the near universal recognition of GID in diagnostic and other medical reference texts, bring petitioner's condition in line with the circumstances where a mental condition has been deemed a "disease" in the caselaw under section 213.

Third, respondent's position that GID is not a significant psychiatric disorder is at odds with the position of every U.S.

Court of Appeals that has ruled on the question of whether GID poses a serious medical need for purposes of the Eighth Amendment, which has been interpreted to require that prisoners receive adequate medical care. See *Estelle v. Gamble*, 429 U.S. 97, 103 (1976). In *Estelle v. Gamble*, *supra* at 104, the U.S. Supreme Court held that "deliberate indifference to serious medical needs of prisoners constitutes the 'unnecessary and wanton infliction of pain' * * * proscribed by the Eighth Amendment." The U.S. Courts of Appeals have accordingly interpreted *Estelle v. Gamble*, *supra*, as establishing a two-prong test for an Eighth Amendment violation: it must be shown that (1) the prisoner had a "serious medical need" which (2) was met with "deliberate indifference" by prison officials. See, e.g., *Cuoco v. Moritsugu*, 222 F.3d 99, 106 (2d Cir. 2000) (applying the Eighth Amendment test to a pretrial detainee); *White v. Farrier*, 849 F.2d 322, 325–327 (8th Cir. 1988).

Seven of the U.S. Courts of Appeals that have considered the question have concluded that severe GID or transsexualism constitutes a "serious medical need" for purposes of the Eighth Amendment. See *De'lonta v. Angelone*, 330 F.3d 630, 634 (4th Cir. 2003); *Allard v. Gomez*, 9 Fed. Appx. 793, 794 (9th Cir. 2001); *Cuoco v. Moritsugu*, *supra*; *Brown v. Zavaras*, 63 F.3d 967, 970 (10th Cir. 1995); *Phillips v. Mich. Dept. of Corr.*, 932 F.2d 969 (6th Cir. 1991), affg. 731 F. Supp. 792 (W.D. Mich. 1990); *White v. Farrier*, *supra*; *Meriwether v. Faulkner*, 821 F.2d 408, 411–413 (7th Cir. 1987); see also *Maggert v. Hanks*, 131 F.3d 670, 671 (7th Cir. 1997) (describing gender dysphoria as a "profound psychiatric disorder").[40] No U.S. Court of Appeals has held otherwise.[41]

Deliberate indifference "requires that a prison official actually know of and disregard an objectively serious condition, medical need, or risk of harm." *De'lonta v. Angelone*, *supra* at 634. Many of the foregoing opinions either found that "deliberate indifference" had not been shown or remanded to

---

[40] The U.S. Supreme Court has also treated transsexualism as a serious medical condition, relying on its listing in the DSM–III and the American Medical Association's Encyclopedia of Medicine (1989). See *Farmer v. Brennan*, 511 U.S. 825, 829 (1994).

[41] Two Courts of Appeals have considered, but found it unnecessary to decide, whether GID or transsexualism constitutes a serious medical need for purposes of the Eighth Amendment. See *Praylor v. Tex. Dept. of Criminal Justice*, 430 F.3d 1208 (5th Cir. 2005), withdrawing 423 F.3d 524 (5th Cir. 2005) (holding that transsexualism constitutes a serious medical need for Eighth Amendment purposes); *Farmer v. Moritsugu*, 163 F.3d 610, 614–615 (D.C. Cir. 1998).

the District Court for further proceedings regarding that point, but they reflect a clear consensus that GID constitutes a medical condition of sufficient seriousness that it triggers the Eighth Amendment requirement that prison officials not ignore or disregard it. [42]

In view of (1) GID's widely recognized status in diagnostic and psychiatric reference texts as a legitimate diagnosis, (2) the seriousness of the condition as described in learned treatises in evidence and as acknowledged by all three experts in this case; (3) the severity of petitioner's impairment as found by the mental health professionals who examined her; (4) the consensus in the U.S. Courts of Appeals that GID constitutes a serious medical need for purposes of the Eighth Amendment, we conclude and hold that GID is a "disease" for purposes of section 213.

## C. *Did Petitioner Have GID?*

Respondent also contends that petitioner was not correctly diagnosed with GID, citing his expert Dr. Schmidt's contentions that certain comorbid conditions such as depression or transvestic fetishism had not been adequately ruled out as explanations of petitioner's condition.

We find that petitioner's GID diagnosis is substantially supported by the record. Ms. Ellaborn was licensed under State law to make such a diagnosis. A second licensed professional concurred, as did petitioner's expert, a recognized authority in the field. Ms. Ellaborn's testimony concerning her diagnosis was persuasive. She considered and ruled out comorbid conditions, including depression and transvestic fetishism, and she believed her initial diagnosis was confirmed by petitioner's experience with the steps in the triadic therapy sequence. [43]

---

[42] But see *Maggert v. Hanks*, 131 F.3d 670 (7th Cir. 1997), where the Court of Appeals for the Seventh Circuit, after concluding that the plaintiff inmate had failed to establish that he had gender dysphoria, observed in dicta that since treatment for gender dysphoria is "protracted and expensive" and the Eighth Amendment does not require that a prisoner be given medical care "that is as good as he would receive if he were a free person", the Amendment "does not entitle a prison inmate to curative treatment for his gender dysphoria." *Id.* at 671–672.

[43] Petitioner's response to the administration of cross-gender hormones is especially persuasive regarding the diagnosis. Ms. Ellaborn observed that petitioner's reaction to the effects of the hormones was essentially positive; that is, the hormones engendered a sense of well-being and a calming effect in petitioner—a well-documented phenomenon in genetic males suffering from GID who receive feminizing hormones, confirmed by both respondent's and petitioner's experts. By contrast, as Dr. Brown observed, when feminizing hormones are administered to non-GID-

Continued

Absent evidence of a patent lack of qualifications, see, e.g., *Flemming v. Commissioner*, T.C. Memo. 1980–583 (rejecting diagnosis of cancer and kidney disease by dentist), this Court has generally deferred, in section 213 disputes, to the judgment of the medical professionals who treated the patient, see, e.g. *Fay v. Commissioner*, 76 T.C. at 414; *Jacobs v. Commissioner*, 62 T.C. at 818; *Fischer v. Commissioner*, 50 T.C. at 173–174. All three witnesses who supported petitioner's GID diagnosis interviewed petitioner. Since Dr. Schmidt did not, his analysis is entitled to considerably less weight, and we conclude that there is no persuasive basis to doubt the diagnosis.

D. *Whether Cross-Gender Hormones, Sex Reassignment Surgery, and Breast Augmentation Surgery "Treat" GID*

1. *Cross-Gender Hormones and Sex Reassignment Surgery*

Our conclusions that GID is a "disease" for purposes of section 213, and that petitioner suffered from it, leave the question of whether petitioner's hormone therapy, sex reassignment surgery, and breast augmentation surgery "[treated]" GID within the meaning of section 213(d)(1)(A) and (9)(B).

In contrast to their dispute over the meaning of "disease", the parties have not disputed the meaning of "treatment" or "treat" as used in section 213(d)(1)(A) and (9)(B), respectively. We accordingly interpret the words in their ordinary, everyday sense. See *Crane v. Commissioner*, 331 U.S. 1, 6 (1947); *Old Colony R.R. Co. v. Commissioner*, 284 U.S. 552, 560 (1932) ("'The legislature must be presumed to use words in their known and ordinary signification'" (quoting *Levy's Lessee v. M'Cartee*, 6 Pet. 102, 110 (1832))); see also *Heard v. Commissioner*, 269 F.2d 911, 912 (3d Cir. 1959) ("The words of * * * [section 213] are to be given their normal meaning without striving to read exceptions into them."), revg. in part 30 T.C. 1093 (1958).

"Treat" is defined in standard dictionaries as: "to deal with (a disease, patient, etc.) in order to relieve or cure", Webster's New Universal Unabridged Dictionary 2015 (2003); "to care for or deal with medically or surgically", Merriam Webster's

_____

suffering males (for other medical reasons), and those males experience impotence, widening hips, and breast development, their response is not a sense of well-being but anxiety.

Collegiate Dictionary 1333 (11th ed. 2008); "5 a: to care for (as a patient or part of the body) medically or surgically: deal with by medical or surgical means: give a medical treatment to * * * b: to seek cure or relief of * * *", Webster's Third New International Dictionary 2435 (2002).

The regulations provide that medical care is confined to expenses "incurred primarily for the prevention or *alleviation* of a physical or mental defect or illness". Sec. 1.213–1(e)(1)(ii), Income Tax Regs. (emphasis added). A treatment should bear a "direct or proximate therapeutic relation to the * * * condition" sufficient "to justify a reasonable belief the * * * [treatment] would be efficacious". *Havey v. Commissioner*, 12 T.C. 409, 412 (1949). In *Starrett v. Commissioner*, 41 T.C. at 881, this Court concluded that the taxpayer's psychoanalysis was a treatment of disease because the taxpayer was "thereby relieved of the physical and emotional suffering attendant upon" the condition known as anxiety reaction.

Hormone therapy, sex reassignment surgery and, under certain conditions, breast augmentation surgery are prescribed therapeutic interventions, or treatments, for GID outlined in the Benjamin standards of care. The Benjamin standards are widely accepted in the psychiatric profession, as evidenced by the recognition of the standards' triadic therapy sequence as the appropriate treatment for GID and transsexualism in numerous psychiatric and medical reference texts.[44] Indeed, every psychiatric reference text that has been established as authoritative in this case endorses sex reassignment surgery as a treatment for GID in appropriate circumstances.[45] No psychiatric reference text has

---

[44] See "Gender Identity", Merck Manuals Second Home Edition, http://www.merck.com/mmhe/print/sec07/ch104/ch104b.html; "Gender Identity Disorder and Transsexualism", Merck Manuals Online Medical Library, *supra*; National Institutes of Health, U.S. National Library of Medicine, Medline Plus Medical Encyclopedia, *supra*; Senagore & Frey, "Orchiectomy", Gale Encyclopedia of Surgery (Thomson Gale 2003).

[45] The following psychiatric reference texts have been established as learned treatises, see Fed. R. Evid. 803(18), and endorse the essential elements of the triadic therapy sequence of the Benjamin standards, including sex reassignment surgery. American Psychiatric Association, Treatments of Psychiatric Disorders, ch. 70 (3d ed., American Psychiatric Press 2001):

The [Benjamin] "Standards of Care" for treating gender-dysphoric individuals, developed by an international group of experts [citation omitted] and followed by most responsible professionals in the field, provides a valuable guide for evaluation and treatment.

* * * * * * *

Continued

been brought to the Court's attention that fails to list, or rejects, the triadic therapy sequence or sex reassignment surgery as the accepted treatment regimen for GID.[46] Several courts have accepted the Benjamin standards as representing

<hr>

Once a patient has met readiness criteria for referral as outlined in the [Benjamin] Standards of Care, she must decide on a surgical technique and surgeon. * * *

Becker, et al., ch. 19, "Sexual and Gender Identity Disorders", in The American Psychiatric Press Textbook of Psychiatry (3d ed.):

Sex reassignment is a long process that must be carefully monitored. * * * If the patient is considered appropriate for sex reassignment, psychotherapy should be started to prepare the patient for the cross-gender role. The patient should then go out into the world and live in the cross-gender role before surgical reassignment. * * * After 1–2 years, if these measures have been successful and the patient still wishes reassignment, hormone treatment is begun. * * * After 1–2 years of hormone therapy, the patient may be considered for surgical reassignment if such a procedure is still desired.

Green, in New Oxford Textbook of Psychiatry, *supra* at 914–915:

* * * The [Benjamin standards of care] programme includes, in addition to ongoing psychiatric or psychological monitoring, possibly endocrine therapy and, depending on the outcome of the graduated trial period of cross-gender living, possibly sex reassignment surgical procedures. The philosophy of treatment is to do reversible procedures before those that are irreversible.

* * * If patients can demonstrate to themselves and mental health experts that they have successfully negotiated the 'Real Life Test' and are adjusting better socially in this new gender role, they can be referred for surgery.

Sadock & Sadock, Kaplan & Sadock's Comprehensive Textbook of Psychiatry 1659–1660 (7th ed., Lippincott Williams & Wilkins 2000):

* * * When the patient's gender dysphoria is severe and intractable, sex reassignment may be the best solution. The first medical intervention in this process is hormone therapy. * * *

* * * The second major stage in the medical treatment of transsexualism is sex reassignment surgery. All major gender identity clinics in North America and western Europe require their patients to live full-time in the cross-gender role for some time—usually 1 to 2 years—prior to surgery.

Tasman et al., Psychiatry 1491–1492 (2d ed., John Wiley & Sons 2003):

The treatment of * * * [gender identity disorders], although not as well-based on scientific evidence as some psychiatric disorders, has been carefully scrutinized by multidisciplinary committees of specialists with the Harry Benjamin International Gender Dysphoria Association [WPATH] for over 20 years. For more details in managing an individual patient, please consult its "Standards of Care" [citation omitted]. * * *

* * * * * * *

Living in the aspired-to-gender role—working, relating, conducting the activities of daily living—is a vital process that enables one of three decisions: to abandon the quest, to simply live in this new role, or to proceed with breast or genital surgery [citation omitted]. * * *

Ideally, hormones should be administered by endocrinologists who have a working relationship with a mental health team dealing with gender problems. * * *

* * * * * * *

Surgical intervention is the final external step.

[46]Respondent offered into evidence a chapter from a psychiatric reference text that respondent claimed did not reference the Benjamin standards of care; namely, Becker, et al., *supra*. However, a review of the chapter cited (particularly pp. 743–744) reveals that the Benjamin triadic sequence—cross-gender hormone therapy, living in the cross-gender role, and sex reassignment surgery—is discussed (without naming the Benjamin standards or WPATH specifically) and endorsed as the appropriate treatment protocol, as set out *supra* note 45.

the consensus of the medical profession regarding the appropriate treatment for GID or transsexualism. See *Gammett v. Idaho State Bd. of Corr.*, No. CV05–257–S–MHW (D. Idaho, July 27, 2007) (memorandum decision and order); *Houston v. Trella*, No. 2:04–CV–01393 (D.N.J., Sept. 25, 2006) (opinion); *Kosilek v. Maloney*, 221 F. Supp. 2d 156, 158 (D. Mass. 2002); *Farmer v. Hawk-Sawyer*, 69 F. Supp. 2d 120, 121 n.3 (D.D.C. 1999).

Nonetheless, respondent's expert Dr. Schmidt contends in his report that "physician acceptance of the * * * [Benjamin standards] is limited" and that the standards are guidelines and are only "accepted as more than guidelines by professionals who advocate for hormonal and surgical treatment of Gender Identity Disorder". However, Dr. Schmidt conceded on cross-examination his prior sworn statement to the effect that he *agreed* with the Benjamin standards (except that psychotherapy should be mandatory rather than recommended) and *was unaware of any significant disagreement with the Benjamin standards in the psychiatric field*, other than those who believe that sex reassignment surgery is unethical, [47] a position that Dr. Schmidt characterized as a minority one. Dr. Schmidt also acknowledged that all GID patients at the sexual disorders clinic at Johns Hopkins where he practices are advised to become familiar with the Benjamin standards of care, and he concedes that cross-gender hormone therapy and sex reassignment surgery "have recognized medical and psychiatric benefits" for persons suffering from GID. [48] Dr. Schmidt also observed in his report that most physicians—indeed, most psychiatrists—know very little about GID or its treatment and shun GID patients, which may explain why the acceptance of the Benjamin standards is not broad based in American medicine. In any event, given his own acceptance of the standards and their use in his

---

[47] Dr. Schmidt cited an article by Dr. Paul McHugh as evidence of the view of sex reassignment surgery as unethical and not medically necessary. On cross-examination, Dr. Schmidt acknowledged that the McHugh article was not published in a peer-reviewed medical journal but instead in a religious publication. See McHugh, "Surgical Sex", First Things, The Institute on Religion and Public Life (November 2004), http://www.firstthings.com/index.php (online edition). Respondent likewise cites the McHugh article on brief as medical opinion, without disclosing the source of its publication.

[48] Dr. Schmidt also acknowledged previously stating that a surgically created vagina in a biological male with GID "creates an internal sense of consistency that is very important in maintaining a balance on a day-to-day basis and not having to bounce back and forth between, you know, am I male or am I female."

clinic, to the extent Dr. Schmidt is suggesting that the standards have limited acceptance among professionals knowledgeable regarding GID, he is unpersuasive. The widespread recognition of the Benjamin standards in the medical literature in evidence strongly supports the conclusion that the standards enjoy substantial acceptance.

Moreover, petitioner's expert Dr. Brown contends that in the case of severe GID, sex reassignment surgery is the only known effective treatment; indeed, Dr. Brown was unaware of any case where psychotherapy alone had been effective in treating severe GID. The U.S. Court of Appeals for the Seventh Circuit and the highest courts of two States have reached similar conclusions. See *Maggert v. Hanks*, 131 F.3d at 671; *Sommers v. Iowa Civil Rights Commn.*, 337 N.W.2d 470, 473 (Iowa 1983); *Doe v. Minn. Dept. of Pub. Welfare*, 257 N.W.2d 816, 819 (Minn. 1977). [49]

Respondent also argues that petitioner's sex reassignment surgery did not "treat" disease within the meaning of section 213(d)(9)(B) because there is insufficient scientific evidence of the surgery's efficacy in treating GID. Petitioner's and respondent's experts disagree regarding the sufficiency of the scientific proof of the surgery's efficacy. Respondent's expert Dr. Schmidt contends that efficacy (beyond patient satisfaction) has not been demonstrated, whereas petitioner's expert Dr. Brown believes there is ample proof of positive therapeutic outcomes.

Psychiatric reference texts support Dr. Brown's position. See Green, "Gender Identity Disorder in Adults", in New Oxford Textbook of Psychiatry 915 (Gelder, et al., eds., Oxford Univ. Press 2000) (stating "Follow-up reports on operated transsexuals are generally quite favorable" and describing a study where transsexual patients were randomly

---

[49] Judge Posner wrote in *Maggert v. Hanks*, 131 F.3d at 671:

The cure for the male transsexual consists not of psychiatric treatment designed to make the patient content with his biological sexual identity—that doesn't work—but of estrogen therapy designed to create the secondary sexual characteristics of a woman followed by the surgical removal of the genitals and the construction of a vagina-substitute out of penile tissue. [Citations omitted.]

See also Tasman et al., Psychiatry 1491 (2d ed., John Wiley & Sons 2003):

No one knows how to cure [through psychotherapy] an adult's gender problem. People who have long lived with profound cross-gender identifications do not get insight—either behaviorally modified or medicated—and find that they subsequently have a conventional gender identity. Psychotherapy is useful, nonetheless [citation omitted]. * * *

divided into two groups, one receiving surgery promptly and the other having surgery postponed for 2 years; "The group that received the earlier surgery showed significant improvement in a range of psychometric measures and maintained employment. The unoperated group showed no improvement in psychological testing and deteriorated in employment"); Green & Blanchard, "Gender Identity Disorders," in Kaplan & Sadock's Comprehensive Textbook of Psychiatry 1660 (Sadock & Sadock, eds., 7th ed., Lippincott Williams & Wilkins 2000) ("Outcome studies as a whole suggest that surgical sex reassignment produces additional improvements in psychosocial adjustment"); Levine, "Sexual Disorders", in Psychiatry 1492 (Tasman, et al., eds., 2d ed., John Wiley & Sons 2005) ("Surgery can be expected to add further improvements in the lives of patients [citation omitted]—more social activities with friends and family, more activity in sports, more partner sexual activity, and improved vocational status").

However, even assuming some debate remains in the medical profession regarding acceptance of the Benjamin standards or the scientific proof of the therapeutic efficacy of sex reassignment surgery, a complete consensus on the advisability or efficacy of a procedure is not necessary for a deduction under section 213. See, e.g., *Dickie v. Commissioner*, T.C. Memo. 1999–138 (naturopathic cancer treatments deductible); *Crain v. Commissioner*, T.C. Memo. 1986–138 (holistic cancer treatments deductible but for failure of substantiation); *Tso v. Commissioner*, T.C. Memo. 1980–399 (Navajo "sings" (healing ceremonies) deductible); Rev. Rul. 72–593, 1972–2 C.B. 180 (acupuncture deductible); Rev. Rul. 55–261, 1955–1 C.B. 307 (services of Christian Science practitioners deductible). It is sufficient if the circumstances "justify a reasonable belief the * * * [treatment] would be efficacious". *Havey v. Commissioner*, 12 T.C. at 412. That standard has been fully satisfied here. The evidence is clear that a substantial segment of the psychiatric profession has been persuaded of the advisability and efficacy of hormone therapy and sex reassignment surgery as treatment for GID, as have many courts.

Finally, the Court does not doubt that, as respondent's expert Dr. Schmidt points out in his report, some medical professionals shun transsexual patients and consider cross-

gender hormone therapy and sex reassignment surgery unethical because they disrupt what is considered to be a "normally functioning hormonal status or destroy healthy, normal tissue." However, the Internal Revenue Service has not heretofore sought to deny the deduction for a medical procedure because it was considered unethical by some. See, e.g., Rev. Rul. 73–201, 1973–1 C.B. 140 (cost of abortion legal under State law is deductible medical care under section 213); Rev. Rul. 55–261, *supra* (services of Christian Science practitioners deductible). Absent a showing of illegality, any such ground for denying a medical expense deduction finds no support in section 213.

In sum, the evidence establishes that cross-gender hormone therapy and sex reassignment surgery are well-recognized and accepted treatments for severe GID. The evidence demonstrates that hormone therapy and sex reassignment surgery to alter appearance (and, to some degree, function[50]) are undertaken by GID sufferers in an effort to alleviate the distress and suffering occasioned by GID, and that the procedures have positive results in this regard in the opinion of many in the psychiatric profession, including petitioner's *and* respondent's experts. Thus, a "reasonable belief" in the procedures' efficacy is justified. See *Havey v. Commissioner*, *supra* at 412. Alleviation of suffering falls within the regulatory and caselaw definitions of treatment, see *Starrett v. Commissioner*, *supra*; sec. 1.213–1(e)(1), Income Tax Regs., and to "relieve" is to "treat" according to standard dictionary definitions. We therefore conclude and hold that petitioner's hormone therapy and sex reassignment surgery "[treated] * * * disease" within the meaning of section 213(d)(9)(B) and accordingly are not "cosmetic surgery" as defined in that section.

While our holding that cross-gender hormone therapy and sex reassignment surgery are not cosmetic surgery is based upon the specific definition of that term in section 213(d)(9)(B), our conclusion that these procedures treat disease also finds support in the opinions of other courts that have concluded for various nontax purposes that sex

_____

[50] The undisputed evidence is that administration of feminizing hormones to genetic male GID sufferers produces a psychological calming effect in addition to physical changes. Sex reassignment surgery in genetic males uses penile tissue in the newly created vagina in a manner designed to make the patient capable of arousal and intercourse.

reassignment surgery and/or hormone therapy are not cosmetic procedures. See, e.g., *Meriwether v. Faulkner*, 821 F.2d at 411–413 (rejecting, in an Eighth Amendment case, the District Court's conclusion that a transsexual inmate's requested hormone therapy was "'elective medication' necessary only to maintain 'a physical appearance and life style'" and noting that numerous courts have "expressly rejected the notion that transsexual surgery is properly characterized as cosmetic surgery, concluding instead that such surgery is medically necessary for the treatment of transsexualism"); *Pinneke v. Preisser*, 623 F.2d 546, 548 (8th Cir. 1980) (State Medicaid plan may not deny reimbursement for sex reassignment surgery on grounds that it is "cosmetic surgery"); *Rush v. Parham*, 440 F. Supp. 383, 390–391 (N.D. Ga. 1977) (to same effect), revd. on other grounds 625 F.2d 1150 (5th Cir. 1980); *J.D. v. Lackner*, 145 Cal. Rptr. 570, 572 (Ct. App. 1978) (sex reassignment surgery is not "cosmetic surgery" as defined in State Medicaid statute; "We do not believe, by the wildest stretch of the imagination, that such surgery can reasonably and logically be characterized as cosmetic."); *G.B. v. Lackner*, 145 Cal. Rptr. 555, 559 (Ct. App. 1978) (to same effect); *Davidson v. Aetna Life & Cas. Ins. Co.*, 420 N.Y.S.2d 450, 453 (N.Y. Sup. Ct. 1979) (sex reassignment surgery is not "cosmetic surgery" within meaning of medical insurance policy exclusion; sex reassignment surgery "is performed to correct a psychological defect, and not to improve muscle tone or physical appearance. * * * [It] cannot be considered to be of a strictly cosmetic nature."). But see *Smith v. Rasmussen*, 249 F.3d 755, 759–761 (8th Cir. 2001) (denial of reimbursement for sex reassignment surgery proper where State Medicaid plan designated sex reassignment surgery as "cosmetic surgery" and alternate GID treatments available).

2. *Breast Augmentation Surgery*

We consider separately the qualification of petitioner's breast augmentation surgery as deductible medical care, because respondent makes the additional argument that this surgery was not necessary to the treatment of GID in petitioner's case because petitioner already had normal breasts before her surgery. Because petitioner had normal breasts before her surgery, respondent argues, her breast augmentation surgery was "directed at improving * * * [her] appearance and [did] not meaningfully promote the proper function of the body or prevent or treat illness or disease", placing the surgery squarely within the section 213(d)(9)(B) definition of "cosmetic surgery". Petitioner has not argued, or adduced evidence, that the breast augmentation surgery ameliorated a deformity within the meaning of section 213(d)(9)(A). Accordingly, if the breast augmentation surgery meets the definition of "cosmetic surgery" in section 213(d)(9)(B), it is not "medical care" that is deductible pursuant to section 213(a).

For the reasons discussed below, we find that petitioner has failed to show that her breast augmentation surgery "[treated]" GID. The Benjamin standards provide that breast augmentation surgery for a male-to-female patient "may be performed if the physician prescribing hormones and the surgeon have documented that breast enlargement after undergoing hormone treatment for 18 months is not sufficient for comfort in the social gender role." The record contains no documentation from the endocrinologist prescribing petitioner's hormones at the time of her surgery. To the extent Ms. Ellaborn's or Dr. Coleman's recommendation letters to Dr. Meltzer might be considered substitute documentation for that of the hormone-prescribing physician, Ms. Ellaborn's two letters are silent concerning the condition of petitioner's presurgical breasts, while Dr. Coleman's letter states that petitioner "appears to have significant breast development secondary to hormone therapy". The surgeon here, Dr. Meltzer, recorded in his presurgical notes that petitioner had "approximately B cup breasts with a very nice shape."[51] Thus, all of the contemporaneous documentation of the condi-

---

[51] Even petitioner conceded in her testimony that she had "a fair amount of breast development * * * from the hormones" at the time of her presurgical consultation with Dr. Meltzer.

tion of petitioner's breasts before the surgery suggests that they were within a normal range of appearance, and there is no documentation concerning petitioner's comfort level with her breasts "in the social gender role".

Dr. Meltzer testified with respect to his notes that his reference to the "very nice shape" of petitioner's breasts was in comparison to the breasts of other transsexual males on feminizing hormones and that petitioner's breasts exhibited characteristics of gynecomastia, a condition where breast mass is concentrated closer to the nipple as compared to the breasts of a genetic female. Nonetheless, given the contemporaneous documentation of the breasts' apparent normalcy and the failure to adhere to the Benjamin standards' requirement to document breast-engendered anxiety to justify the surgery, we find that petitioner's breast augmentation surgery did not fall within the treatment protocols of the Benjamin standards and therefore did not "treat" GID within the meaning of section 213(d)(9)(B). Instead, the surgery merely improved her appearance.

The breast augmentation surgery is therefore "cosmetic surgery" under the section 213(d)(9)(B) definition unless it "meaningfully [promoted] the proper function of the body". The parties have stipulated that petitioner's breast augmentation "did not promote the proper function of her breasts". Although petitioner expressly declined to stipulate that the breast augmentation "did not meaningfully promote the proper functioning of her body within the meaning of I.R.C. § 213", we conclude that the stipulation to which she did agree precludes a finding on this record, given the failure to adhere to the Benjamin standards, that the breast augmentation surgery "meaningfully [promoted] the proper function of the body" within the meaning of section 213(d)(9)(B). Consequently, the breast augmentation surgery is "cosmetic surgery" that is excluded from deductible "medical care".[52]

---

[52] Respondent also argues that the various surgical procedures petitioner underwent to feminize her facial features in 2000 and 2005 demonstrate a propensity for cosmetic surgery that is relevant in assessing whether petitioner's hormone therapy and sex reassignment surgery were undertaken for the purpose of improving petitioner's appearance rather than treating a disease.

We disagree. The deductibility of petitioner's facial surgery, undertaken in years other than the year in issue, is not at issue in this case. However, there is substantial evidence that such surgery may have served the same therapeutic purposes as (genital) sex reassignment surgery and hormone therapy; namely, effecting a female appearance in a genetic male. Both Ms.

Continued

E. *Medical Necessity*

Finally, respondent argues that petitioner's sex reassignment surgery was not "medically necessary",[53] which respondent contends is a requirement intended by Congress to apply to procedures directed at improving appearance, as evidenced by certain references to "medically necessary" procedures in the legislative history of the enactment of the cosmetic surgery exclusion of section 213(d)(9).[54] Respondent in effect argues that the legislative history's contrast of nondeductible cosmetic surgery with "medically necessary" procedures evidences an intent by Congress to impose a requirement in section 213(d)(9) of medical necessity for the deduction of procedures affecting appearance. We find it unnecessary to resolve respondent's claim that section 213(d)(9) should be interpreted to require a showing of "medical necessity" notwithstanding the absence of that phrase in the statute. That is so because respondent's contention would not bar the deductions at issue, inasmuch as we are persuaded, as discussed below, that petitioner has shown that her sex reassignment surgery was medically necessary.

Respondent's basis for the claim that petitioner's sex reassignment surgery was not medically necessary is the

Ellaborn and Dr. Meltzer testified that petitioner had masculine facial features which interfered with her passing as female. The expert testimony confirmed that passing as female is important to the mental health of a male GID sufferer, and the Benjamin standards contemplate surgery to feminize facial features as part of sex reassignment for a male GID sufferer. Thus, we conclude that the facial surgery does not suggest, as respondent contends, that petitioner had a propensity for conventional cosmetic surgery.

[53] Respondent does not make this argument with respect to petitioner's hormone therapy. His own expert, Dr. Schmidt, effectively concedes the medical necessity of hormone therapy when he argues that sex reassignment surgery is not medically necessary because hormone therapy is one of the "alternative, successful methods of managing Gender Identity Disorder short of surgery."

[54] Respondent relies upon the following excerpts from the report of the Senate Finance Committee issued in connection with the enactment of the cosmetic surgery exclusion of sec. 213(d)(9):

Expenses for purely cosmetic procedures that are not medically necessary are, in essence, voluntary personal expenses, which like other personal expenditures (e.g., food and clothing) generally should not be deductible in computing taxable income.

\*        \*        \*        \*        \*        \*        \*

\* \* \* [E]xpenses for procedures that are medically necessary to promote the proper function of the body and only incidentally affect the patient's appearance \* \* \* continue to be deductible \* \* \*. [136 Cong. Rec. 30485, 30570 (1990).]

The Senate Finance Committee report is set out more fully *supra* note 27. We note that the discussion of sec. 213(d)(9) in the conference report issued with respect to the agreed final version of sec. 213(d)(9) contains no reference to "medical necessity" or any variant of the phrase. See H. Conf. Rept. 101–964, at 1031 (1990), 1991–2 C.B. 560, 562.

expert report and testimony of his expert, Dr. Schmidt. Dr. Schmidt acknowledges in his report that the definition of medical necessity "varies according to the defining party". Dr. Schmidt never expressly defines the term, but he concludes that sex reassignment surgery is not medically necessary because (1) no "community" standard of care requires it (so that a practitioner's failure to provide the surgery would not constitute malpractice) and (2) in his view a therapist should remain neutral regarding the decision to have the surgery—which makes the surgery, Dr. Schmidt reasons, elective.[55] Taken together, these two factors indicate that the surgery is not medically necessary, in Dr. Schmidt's view. Respondent has not shown that Dr. Schmidt's concept of medical necessity is widely accepted, and it strikes the Court as idiosyncratic and unduly restrictive. Moreover, Dr. Schmidt also expressed the view that sex reassignment surgery has "recognized medical and psychiatric benefits" and is "certainly medically helpful".

Dr. Schmidt conceded in his report that a significant segment of those physicians who are knowledgeable concerning GID believes that sex reassignment surgery *is* medically necessary, ranging from those who believe such surgery is generally medically necessary in treating GID to those who think it is medically necessary in selected cases. As noted, petitioner's expert Dr. Brown believes that sex reassignment surgery is often the only effective treatment for severe GID, and a number of courts have concurred. Dr. Brown therefore believes the surgery is medically necessary for severe GID. See also Sadock & Sadock, *supra* ("When the patient's gender dysphoria is severe and intractable, sex reassignment may be the best solution.") Several courts have also concluded in a variety of contexts that sex reassignment surgery for severe GID or transsexualism is medically necessary. See *Meriwether v. Faulkner*, 821 F.2d at 412; *Pinneke v. Preisser*, 623 F.2d at 548; *Sommers v. Iowa Civil Rights Commn.*, 337 N.W.2d at 473; *Doe v. Minn. Dept. of Pub. Welfare*,

---

[55] Petitioner's expert Dr. Brown disagrees with the view that a therapist should remain neutral regarding the decision to undergo sex reassignment surgery, believing that a patient experiencing the distress of GID is not well equipped to make a decision on irreversible surgery. In Dr. Brown's opinion, the therapist should counsel patients towards less invasive treatments until they have proven ineffective and the surgery appears to be the only effective alternative left.

257 N.W.2d at 819; *Davidson v. Aetna Life & Cas. Ins. Co.*, 420 N.Y.S.2d at 453.

The mental health professional who treated petitioner concluded that petitioner's GID was severe, that sex reassignment surgery was medically necessary, and that petitioner's prognosis without it was poor. Given Dr. Brown's expert testimony,[56] the judgment of the professional treating petitioner, the agreement of all three experts that untreated GID can result in self-mutilation and suicide, and, as conceded by Dr. Schmidt, the views of a significant segment of knowledgeable professionals that sex reassignment surgery is medically necessary for severe GID, the Court is persuaded that petitioner's sex reassignment surgery was medically necessary.

## IV. *Conclusion*

The evidence amply supports the conclusions that petitioner suffered from severe GID, that GID is a well-recognized and serious mental disorder, and that hormone therapy and sex reassignment surgery are considered appropriate and effective treatments for GID by psychiatrists and other mental health professionals who are knowledgeable concerning the condition. Given our holdings that GID is a "disease" and that petitioner's hormone therapy and sex reassignment surgery "[treated]" it, petitioner has shown the "existence * * * of a disease" and a payment for goods or services "directly or proximately related" to its treatment. See *Jacobs v. Commissioner*, 62 T.C. at 818. She likewise satisfies the "but for" test of *Jacobs*, which requires a showing that the procedures were an essential element of the treatment and that they would not have otherwise been undertaken for nonmedical reasons. Petitioner's hormone therapy and sex reassignment surgery were essential elements of a widely accepted treatment protocol for severe GID. The expert testimony also establishes that given (1) the risks, pain, and extensive rehabilitation associated with sex reassignment surgery, (2) the stigma encountered by persons

[56] When weighing Dr. Brown's and Dr. Schmidt's opposing views on whether sex reassignment surgery is medically necessary, we consider that Dr. Brown is widely published in peer-reviewed medical journals and academic texts on the subject of GID, whereas Dr. Schmidt is not. Accordingly, there is a reasonable basis to conclude that Dr. Brown's views are more widely recognized and accepted in the psychiatric profession.

who change their gender role and appearance in society, and (3) the expert-backed but commonsense point that the desire of a genetic male to have his genitals removed requires an explanation beyond mere dissatisfaction with appearance (such as GID or psychosis), petitioner would not have undergone hormone therapy and sex reassignment surgery except in an effort to alleviate the distress and suffering attendant to GID. Respondent's contention that petitioner undertook the surgery and hormone treatments to improve appearance is at best a superficial characterization of the circumstances that is thoroughly rebutted by the medical evidence.

Petitioner has shown that her hormone therapy and sex reassignment surgery treated disease within the meaning of section 213 and were therefore not cosmetic surgery. Thus petitioner's expenditures for these procedures were for "medical care" as defined in section 213(d)(1)(A), for which a deduction is allowed under section 213(a).

To reflect the foregoing and concessions by the parties,

*Decision will be entered under Rule 155*.

Reviewed by the Court.

COLVIN, COHEN, THORNTON, MARVEL, WHERRY, PARIS, and MORRISON, *JJ.*, agree with this majority opinion.

––––––––––––

HALPERN *J*., concurring: I substantially agree with the majority. I write separately to offer one comment on the majority's rationale for disallowing petitioner's deduction for her breast augmentation surgery and to offer additional comments on positions taken in other side opinions.

I. *Breast Augmentation Surgery*

I am satisfied with the majority's decision to disallow a deduction for petitioner's breast augmentation surgery on the ground that it did not fall within the treatment protocols of the Benjamin standards. Majority op. p. 73. For me, that petitioner failed to prove her doctors adhered to the Benjamin standards requirement that they document her breast-engendered anxiety is sufficient to find that the surgery did not fall within those standards. The majority's added reason, "the breasts' apparent normalcy", majority op. p. 73, I find

superfluous and potentially misleading. In particular, the observation of Dr. Meltzer, petitioner's surgeon, in his pre-surgical note that petitioner's breasts were of a very nice shape was not an aesthetic judgment but rather a clinical observation relating to the shape of her breasts in comparison to the breasts of other transsexual males on feminizing hormones. Moreover, Dr. Meltzer testified that the surgery was different from the surgery he would perform on a biological female: "[I]t was to give her a female looking breast, which is quite different from a male breast". In response to a question from the Court, he testified that the primary purpose of the breast surgery was not to improve petitioner's appearance but "to assign her to the appropriate gender". His medical notes should not be taken out of context.

## II. *Statutory Interpretation*

### A. *Introduction*

We face a task that is not unusual for us, that is, interpreting the Internal Revenue Code, and we employ a set of tools (canons of construction and the like) that are familiar to both us and the parties. My colleagues raise arguments in support of respondent that he did not make.[1] Because they are not addressed by the majority, I use this opportunity to address some of them.

### B. *Sex Reassignment Surgery, Treatment, and Mitigation*

For the sake of argument, I accept the distinction Judge Gustafson draws between the words "treat" and "mitigate". Nevertheless, his argument that sex reassignment surgery only mitigates (and does not treat) GID rests on a subtle misunderstanding of that disease.

For Judge Gustafson, petitioner's disease was the "delusion" that she was a female. Gustafson op. note 9. Judge Gustafson cannot fathom that someone with a healthy male body who believes he is female is not sick of mind. Yet the record suggests that the disease is more than that. A

---

[1] Clearly the issues before us are important to respondent. His opening brief is 209 pages long, and his answering brief is 72 pages long. Between them, the two briefs show a total of eight attorneys assisting the Chief Counsel, in whose name the briefs are filed. I assume that respondent made all the arguments that he thought persuasive.

biological male who is convinced he is a woman but does not exhibit clinically significant distress or impaired functioning fails to satisfy at least one precondition set forth in DSM–IV– TR for a diagnosis of GID.[2] Simply put, the "delusion" itself is not the disease. Instead, for someone suffering from severe GID (like petitioner) the medical problem—the disease—is the symptoms. For a significant part of the medical community, sex reassignment surgery is an accepted approach to elimi- nating a sufficient number of those symptoms so that a diag- nosis of GID will no longer hold. And if the diagnosis will no longer hold, then the patient is cured.

Petitioner's expert, George R. Brown, M.D., was of the opinion that sex reassignment surgery does not change the patient's belief that his or her psychological gender does not match his or her biological sex. Nevertheless, he was of the opinion that, by virtue of petitioner's hormone therapy and sex reassignment surgery, she was cured of her GID, "which due to the severity and long-standing nature of her condition, would not have been possible without hormones and sex reassignment surgery." He testified that, by "cured", he meant that the symptoms of the disorder were no longer present for an extended period. She was cured, he testified, because, when he examined her in March 2007 to prepare his expert testimony, she no longer met the criteria for a diag- nosis of GID. For instance, he testified, she had been free for a long time of clinically significant distress or impairment resulting from a misalignment of her body and her psycho- logical sex. Indeed, his explanation comports with a consider- ation of the diagnostic criteria in DSM–IV–TR (cited by the majority, majority op. p. 36) for GID. In discussing the diag- nostic features of GID, DSM–IV–TR states: "To make the diag- nosis [of GID], there must be evidence of clinically significant distress or impairment in social, occupational, or other important areas of functioning."

Dr. Brown seems to have concluded that petitioner was cured according to the notion discussed above that a disease is characterized by an identifiable group of signs or symp- toms,[3] and when those signs or symptoms, once present, are

---

[2] See discussion of that precondition in the immediately following paragraph.

[3] The principal meaning of "disease" in the American Heritage Dictionary of the English Lan- guage 517 (4th ed. 2000) is: "A pathological condition of a part, organ, or system of an organism

Continued

no longer present in sufficient degree or severity to characterize (diagnose) the disease, the patient is free of the disease; i.e., she is "cured". Whether in fact petitioner was free of clinically significant distress or impairment (there may have been some disagreement among the doctors) [4] has no effect on the force of Dr. Brown's argument. If petitioner could be cured, then she could be treated, [5] and, as the majority makes clear, we do not ground decisions as to medical care on the efficacy of the treatment. Majority op. pp. 69–70. Judge Gustafson has failed to convince me that we should understand the verb "to cure" in any but the way Dr. Brown uses it.

### C. *The Intent of Congress*

Judge Goeke rejects surgery as a treatment for GID because of his contextual reading of the statute: "I believe that the word 'treat' in the context of the cosmetic surgery exclusion implies that for expenses for any procedure to be deductible, the procedure must address a physically related malady." Goeke op. p. 102. Judge Goeke, like Judge Gustafson, however, fails to provide any convincing support for his position.

Judge Goeke's contextual argument relies heavily on his discerning congressional purpose from the report of the Senate Finance Committee discussed by the majority, majority op. note 27, and quoted by Judge Goeke, Goeke op. p. 103. In the light of the report language that he quotes, Judge Goeke argues: "The * * * Senate Finance Committee report indicates that Congress intended to allow deductions only for cosmetic surgery to correct physical maladies resulting from disease or physical disfigurement". Goeke op. p. 103. I disagree in general with Judge Goeke's reliance on the report given the unambiguous language of section 213(d)(9), and I disagree in particular with the inference he draws from the report.

---

resulting from various causes, such as infection, genetic defect, or environmental stress, and *characterized by an identifiable group of signs or symptoms*." (Emphasis added.)

[4] In rebuttal to Dr. Brown, respondent's expert, Chester W. Schmidt, Jr., M.D., disagreed with Dr. Brown's use of the word "cure" in connection with petitioner, since she continued to suffer from psychiatric disorders, but he did not dispute that someone who presents no symptoms of a disease would be considered cured of that disease.

[5] Judge Gustafson seems to concede that if GID is curable, then it is treatable: "[A]ny procedure that does 'cure' a disease necessarily 'treats' it." Gustafson op. note 7.

In *Campbell v. Commissioner*, 108 T.C. 54, 62–63 (1997), we set forth the well-established and well-understood rules for construing a provision of the Internal Revenue Code:

In construing * * * [a provision of the Internal Revenue Code], our task is to give effect to the intent of Congress, and we must begin with the statutory language, which is the most persuasive evidence of the statutory purpose. *United States v. American Trucking Associations, Inc.*, 310 U.S. 534, 542–543 (1940). Ordinarily, the plain meaning of the statutory language is conclusive. *United States v. Ron Pair Enters. Inc.*, 489 U.S. 235, 242 (1989). Where a statute is silent or ambiguous, we may look to legislative history in an effort to ascertain congressional intent. *Burlington N. R.R. v. Oklahoma Tax Commn.*, 481 U.S. 454, 461 (1987); *Griswold v United States*, 59 F.3d 1571, 1575–1576 (11th Cir. 1995). However, where a statute appears to be clear on its face, we require unequivocal evidence of legislative purpose before construing the statute so as to override the plain meaning of the words used therein. *Huntsberry v. Commissioner*, 83 T.C. 742, 747–748 (1984); see *Pallottini v. Commissioner*, 90 T.C. 498, 503 (1988), and cases there cited.

The word "treat" is found in section 213(d)(9) only in the definition of "cosmetic surgery" in section 213(d)(9)(B). [6] It forms part of the expression "does not * * * prevent or treat illness or disease", and nothing in the definition indicates that the expression excludes surgical treatments for mental illness or mental disease. The language of section 213(d)(9)(B) is sufficiently plain that, in searching the legislative history of the provision for a contradiction, I would keep firmly in mind the Supreme Court's injunction in *United States v. Ron Pair Enters., Inc.*, 489 U.S. 235, 242 (1989): Ordinarily, the plain meaning of the statutory language is conclusive.

I would also keep in mind that, as quoted above, "where a statute appears to be clear on its face, we require unequivocal evidence of legislative purpose before construing the statute so as to override the plain meaning of the words

---

[6] That provision, on its face, is ambiguous only to the extent that, to give meaning to the term "other similar procedures" in sec. 213(d)(9)(A), the word "surgical" probably should be inferred before the word "procedure". Sec. 213(d)(9)(B) would then read: "Cosmetic surgery defined.—For purposes of this paragraph, the term 'cosmetic surgery' means any [*surgical*] procedure which is directed at improving the patient's appearance and does not meaningfully promote the proper function of the body or prevent or treat illness or disease."

Without the inferred "surgical", the set of procedures constituting "cosmetic surgery" would seem to encompass every procedure (surgical or not) doing nothing other than improving the patient's appearance, apparently leaving "other similar procedures" an empty set (empty because all procedures directed at improving appearance would already be in the set labeled "cosmetic surgery").

used therein." *Campbell v. Commissioner*, *supra* at 63. Here there is no such evidence. The paragraph of the Senate Finance Committee report on which Judge Goeke relies does not adequately illuminate subparagraph (B) of section 213(d)(9) because it discusses "disease" only in the context of the amelioration of a "disfiguring disease" in subparagraph (A) of that section. [7] The report does not even mention that, according to the definition of cosmetic surgery, a procedure that prevents or treats illness or disease will not be classified as cosmetic surgery under section 213(d)(9)(B). The Senate Finance Committee report is far from unequivocal evidence of legislative purpose contrary to that to be inferred from the plain language of section 213(d)(9)(B). [8] I would stick with the plain language and read "treat" and "illness or disease" to have their ordinary meanings.

## D. *The Plain Language of the Provision*

Judge Foley takes both the majority and respondent to task for not adhering to the plain language of section 213(d)(9). The plain language, he argues, compels the conclusion that for surgery directed at improving appearance to escape classification as cosmetic surgery under section 213(d)(9)(B) it must *both* meaningfully promote the proper function of the body *and* prevent or treat illness or disease. [9]

---

[7] The reference to "disfiguring disease" in subpar. (A) of sec. 213(d)(9) is also clear on its face. That term is the object of the verb "to ameliorate", which is different from the verb "to treat". To treat a disease is to seek to cure it; to ameliorate a disfiguring disease is seek to reduce the effects of a disease now gone. For example, consider dermal abrasion to erase scars left by a severe case of adolescent acne.

[8] Indeed, H. Conf. Rept. 101–964, at 1032 (1990), 1991–2 C.B. 560, 562, which accompanied the Omnibus Budget Reconciliation Act of 1990, Pub. L. 101–508, sec. 11342(a), 104 Stat. 1388–471 (adding sec. 213(d)(9)), and which postdates the Senate Finance Committee report, describes the Senate amendment adding sec. 213(d)(9) in the exact terms of the statute:

The Senate Amendment provides that expenses paid for cosmetic surgery or other similar procedures are not deductible medical expenses, unless the surgery or procedure is necessary to ameliorate a deformity arising from, or directly related to, a congenital abnormality, a personal injury resulting from an accident or trauma, or disfiguring disease. For purposes of this provision, cosmetic surgery is defined as any procedure which is directed at improving the patient's appearance and does not meaningfully promote the proper function of the body or prevent or treat illness or disease.

N.b.: The term "disease" is used twice, in two different contexts, and, as the majority notes, majority op. note 54, there is no reference to "medical necessity".

[9] Judge Foley does not put it that way (i.e., stating what cosmetic surgery is *not*), but that must be what he means, because he writes: "Thus, if petitioner's procedures are 'directed at improving * * * appearance' and '[do] not meaningfully promote the proper function of the body', they are cosmetic surgery without regard to whether they treat a disease." Foley op. p. 105. I assume he would concede that a procedure directed at improving appearance that *both* meaning-

He further argues that, even if not cosmetic surgery within the meaning of section 213(d)(9)(B), petitioner's sex reassignment surgery and related procedures (I assume the hormone therapy) may be "other similar procedures" under section 213(d)(9)(A). I believe that Judge Foley is wrong on his first count and that, with respect to his second count, neither the sex reassignment surgery nor the hormone therapy falls within the class of "other similar procedures".

I agree with Judge Foley that section 213(d)(9)(B) sets forth a two-part test: A procedure is cosmetic surgery if it (1) is directed at improving appearance and (2) does not meaningfully promote the proper function of the body or prevent or treat illness or disease. Because the second part of the test contains two expressions separated by "or", that part of the test contains a "disjunction"; i.e., a compound proposition that is true if one of its elements is true. Importantly, however, the second part of the test contains not just a disjunction (i.e., (p or q)), but rather the negation of a disjunction (i.e., not (p or q)). Judge Foley errs because he assumes that the expression "not (p or q)" is equivalent to the expression "(not p) or (not q)". Thus, he redefines cosmetic surgery such that: "A procedure 'directed at improving the patient's appearance' is cosmetic surgery if it either does not 'meaningfully promote the proper function of the body' *or* does not 'prevent or treat illness or disease.'" Foley p. 105. Judge Foley simply disregards the rules of grammar and logic in favor of a part of the legislative history that is silent as to the interpretative question he fashions.

In formal logic, there is a set of rules, De Morgan's laws, relating the logical operators "and" and "or" in terms of each other via negation. E.g., http://en.wikipedia.org/wiki/De_Morgan's_laws. The rules are:

$$\text{not (p or q)} = \text{(not p) and (not q)}$$
$$\text{not (p and q)} = \text{(not p) or (not q)}$$

The first of the rules would appear to govern the disjunction in section 213(d)(9)(B), which is of the form "not (p or q)". Its equivalent is of the form "(not p) and (not q)", which, substituting the relevant words, is: "does not meaningfully promote the proper function of the body and does not prevent or

---

fully promotes function *and* treats a disease is *not* cosmetic surgery.

treat illness or disease". The two-part test of section 213(d)(9)(B) for determining whether a procedure is cosmetic surgery could then equivalently be rewritten: A procedure is cosmetic surgery if it (1) is directed at improving appearance and (2) does not meaningfully promote the proper function of the body and does not prevent or treat illness or disease. The second expression is true only if the procedure *neither* meaningfully promotes the proper function of the body *nor* prevents or treats illness or disease. If one of the alternatives is true, however, then the expression is false and the test is flunked, so that the procedure is *not* cosmetic surgery. That, of course, contradicts Judge Foley's reading of the statute, but I believe the better view is to presume that Congress is careful in its drafting and drafts in accordance, rather than in conflict, with the rules of grammar and logic.

Finally, Judge Foley argues that the "similar procedures" referred to in section 213(d)(9)(A) are delimited only by the exceptions found in that provision and *not* the exceptions to the definition of cosmetic surgery found in section 213(d)(9)(B).[10] That reading seems wrong: Does Judge Foley suggest that even "similar procedures" that "meaningfully promote the proper function of the body" *and* "prevent or treat illness or disease" are *not* deductible "medical care"? That cannot be correct. As I noted earlier, if we infer the word "surgical" before the word "procedure" in the section 213(d)(9)(B) definition of cosmetic surgery, then the term "other similar procedures" in section 213(d)(9)(A) is given meaning. I would argue that "other similar procedures" refers to nonsurgical, appearance-enhancing procedures, such as hormone therapy, the deductibility of which is tested by applying first the exceptions in section 213(d)(9)(B), then those in section 213(d)(9)(A). Petitioner's sex reassignment surgery is excluded from the class of "other similar procedures" principally because it is surgical. Her hormone therapy is excluded because, as the majority finds, it treats her disease.

---

[10] I assume that Judge Foley would concede that "other similar procedures", like cosmetic surgery, must be directed at improving appearance. If not, it is difficult to imagine what boundaries Congress had in mind for other "similar" procedures.

E. *Medical Necessity*

Without deciding whether section 213(d)(9) requires a showing of medical necessity, the majority nonetheless finds that petitioner's sex reassignment surgery was medically necessary. Majority op. p. 74. Apparently, the majority is preparing for a perhaps different view of the statute by the Court of Appeals. Judge Holmes' Brandeis brief[11] exhibits impressive scholarship, discussing much that is outside the record. We are a trial court, however, principally restricted to evidence presented, and arguments made, by the parties. See *Snyder v. Commissioner*, 93 T.C. 529, 531–535 (1989). On the record before us, and as argued by respondent, the majority's finding is not clearly erroneous.

––––––––––––––

HOLMES, *J.*, concurring: On this record, for this taxpayer, and on the facts found by the Judge who heard this case, I agree with the majority's conclusion—that O'Donnabhain can deduct the cost of her hormone therapy and sex-reassignment surgery, but not her breast-augmentation surgery. I also agree with the majority that GID is a mental disorder, and therefore a disease under section 213. But I disagree with the majority's extensive analysis concluding that sex reassignment is the proper treatment—indeed, medically necessary at least in "severe" cases—for GID. It is not essential to the holding and drafts our Court into culture wars in which tax lawyers have heretofore claimed noncombatant status.

––––––––––

[11] A Brandeis brief is:

A brief, [usually] an appellate brief, that makes use of social and economic studies in addition to legal principles and citations. * * * The brief is named after Supreme Court Justice Louis D. Brandeis, who as an advocate filed the most famous such brief in *Muller v. Oregon*, 208 U.S. 412 * * * (1908), in which he persuaded the Court to uphold a statute setting a maximum ten-hour workday for women.

Black's Law Dictionary 213 (9th ed. 2009); see *Snyder v. Commissioner*, 93 T.C. 529, 533–534 (1989).

I.

A.

What does it mean for a person born male to testify, as did O'Donnabhain, that "I was a female. The only way for me to—the only way for me to be the real person that I was in my mind was to have this surgery"?

This is not like saying "Lab tests show *Vibrio cholerae*, and therefore I have cholera", or "the X-ray shows a tumor in the lung and therefore I have lung cancer", or even "the patient reports that he is Napoleon and is being chased by the English", and therefore has schizophrenia.

In the crash course on transsexualism that this case has forced on us, there are at least four approaches that those who've studied the phenomenon of such feelings have had. One response, curtly dismissed by the majority, is that this is a form of delusion:

> It is not obvious how this patient's feeling that he is a woman trapped in a man's body differs from the feeling of a patient with anorexia nervosa that she is obese despite her emaciated, cachectic state. We don't do liposuction on anorexics. Why amputate the genitals of these poor men? Surely, the fault is in the mind and not the member.

McHugh, "Psychiatric Misadventures", Am. Scholar 497, 503 (1992). For such psychiatrists, gender follows sex, is a fundamental part of human nature, and is not easily amenable to change. Those who take this view look at transsexual persons to uncover what they suspect are comorbidities—other things wrong with their patients that might explain the undoubtedly powerful feeling that they are wrongly sexed and whose treatment might alleviate the stress that it causes them.

A second approach focuses on the notion of "feeling female." What does this mean? The answer adopted by the majority and urged by O'Donnabhain is that this is a shorthand way of saying that a transsexual person's gender (i.e., characteristic way of feeling or behaving, and conventionally labeled either masculine or feminine) is strongly perceived by her as mismatched to her sex (i.e., biological characteristics).[1] This, too, is highly contested territory—gender being

---

[1] For a longer discussion on the definitions of gender versus sex, see Meyer, "The Theory of

thought by many, particularly feminists, to be entirely something society imposes on individuals. To such theorists, transsexualism is likewise a social construct:

The medical profession need not direct the gender dissatisfied to surgery. Counselling is possible to encourage clients to take a more political approach to their situation and to realize that they can rebel against the constraints of a prescribed gender role, and relate to their own sex in their native bodies.

Jeffreys, "Transgender Activism: A Lesbian Feminist Perspective," 1 J. Lesbian Stud. 55, 70 (1997) (suggesting SRS be proscribed as "crime against humanity"); see also *id.* at 56 (citing Raymond, The Transsexual Empire (Teachers College Press 1994)).

Yet a third school of thought is that the origins of at least many (but not all) transsexual feelings—particularly those with extensive histories of secret transvestism—is that it's not about gender, but about a particular kind of erotic attachment. See, e.g., Blanchard, "Typology of Male-to-Female Transsexualism," 14 Archives Sexual Behav. 247 (1985); Cohen-Kettenis & Gooren, "Transsexualism: A Review of Etiology, Diagnosis and Treatment," 46 J. Psychosomatic Res. 315, 321–22 (1999) (summarizing research); Lawrence, "Clinical and Theoretical Parallels Between Desire for Limb Amputation and Gender Identity Disorder," 35 Archives Sexual Behav. 263 (2006). Scholars of this school regard SRS as justified—not so much to cure a disease, but because SRS relieves suffering from an intense, innate, fixed, but otherwise unobtainable desire. See, e.g., Dreger, "The Controversy Surrounding *The Man Who Would Be Queen*: A Case History of the Politics of Science, Identity, and Sex in the Internet Age," 37 Archives Sexual Behav. 366, 383–84 (2008).

These are all intensely contested viewpoints. The fourth and currently predominant view among those professionally involved in the field is the one urged by O'Donnabhain, and

Gender Identity Disorders," 30 J. Am. Psychoanalytic Assn. 381, 382 (1982) ("Although the term 'gender' is sometimes used as a synonym for biological 'sex,' the two should be distinguished. Sex refers to the biology of maleness or femaleness, such as a 46,XY karyotype, testes, or a penis. Gender or gender identity is a psychological construct which refers to a basic *sense* of maleness or femaleness or a *conviction* that one is male or female. While gender is ordinarily consonant with biology, and so may appear to be a function of it, gender may be remarkably free from biological constraint. The sense that 'I am a female' in transsexualism, for example, may contrast starkly with a male habitus.")

not effectively contested by the Commissioner: that the reason a transsexual person seeks SRS is to correct a particular type of birth defect—a mismatch between the person's body and her gender identity. That mismatch has a name—GID—if not yet any clinically verifiable origin, and SRS (plus hormone therapy) is simply the correct treatment of the disorder.

I profess no expertise in weighing the merits of biodeterminism, feminism, or any of the competing theories on this question. But the majority's decision to devote significant analysis to the importance of characterizing GID as a disease, and SRS as its medically necessary treatment, pulls me into such matters to give context to the majority's analysis.

B.

The majority relies heavily on the Benjamin standards to establish the proper diagnosis and treatment of GID. I certainly agree that these standards express the consensus of WPATH—the organization that wrote them and has seen six revisions of them over the last 30 years. But the consensus of WPATH is not necessarily the consensus of the entire medical community. The membership of WPATH is limited, consisting of professionals that work with transsexual patients, including social workers, psychiatrists, and surgeons that perform SRS.

The Commissioner's expert, Dr. Schmidt, testified that the Benjamin standards are merely guidelines rather than true standards of care and that they enjoy only limited acceptance in American medicine generally. The majority cites several psychiatric textbooks that mention the Benjamin standards to refute Dr. Schmidt's claim and as evidence of their general acceptance in the psychiatric profession. Majority op. note 45. But the textbooks treat the Benjamin standards as mere guidelines—which may or may not be followed—rather than clearly endorsing SRS. Let's take a closer look at the excerpted language from each of the majority's sources:

- "[The Benjamin standards] [provide] a valuable *guide*;"
- "[T]he patient *may* be considered for surgical reassignment;"
- "The [Benjamin standards of care] programme includes * * * *possibly* sex reassignment * * * patients * * * *can* be referred for surgery;"
- "[S]ex reassignment *may* be the best solution;" and
- After noting that the treatment of gender identity disorders is "*not as well-based on scientific evidence as some psychiatric disorders,*" the cited text states that "[l]iving in the aspired-to gender role * * * enables *one of three decisions*: to abandon the quest, to simply live in this new role, or to proceed with breast or genital surgery."

See majority op. note 45 (all emphasis added and citations omitted). The textbooks do not say that SRS "should" or "must" be used as treatment for GID, but only that it "may" or "can" be used. The members of WPATH certainly follow the Benjamin standards, but since they are merely a "guide" and "not as well-based on scientific evidence" as other psychiatric treatments, their general acceptance is questionable. The American Psychiatric Association's practice guidelines—generally accepted standards of care—make no mention of the Benjamin standards.[2] Even the Benjamin standards themselves contain the following caveat in the introduction:

All readers should be aware of the limitations of knowledge in this area and of the hope that some of the clinical uncertainties will be resolved in the future through scientific investigation.

The Harry Benjamin International Gender Dysphoria Association's Standards of Care for Gender Identity Disorders, Sixth Version 1 (2001).

WPATH is also quite candid that it is an advocate for transsexual persons, and not just interested in studying or treating them. Its website includes a downloadable statement that can be sent to insurers or government agencies denying reimbursement or payment for surgery to those diagnosed with GID. WPATH, "WPATH Clarification on Medical Necessity of Treatment, Sex Reassignment, and Insurance Coverage in the U.S.A.," (June 17, 2008), *available at* http://www.tgender.net/taw/WPATHMedNecofSRS.pdf (last visited

---

[2] See APA, Practice Guidelines, http://www.psych.org/MainMenu/PsychiatricPractice/PracticeGuidelines__1.aspx (last visited Jan. 7, 2010).

Jan. 7, 2010). But it also comprehensively addresses other problems it feels should be solved. For example,

Genital reconstruction is not required for social gender recognition, and such surgery should not be a prerequisite for document or record changes * * *. Changes to documentation are important aids to social functioning, and are a necessary component of the pre-surgical process * * *.

*Id.* at 2. Claims of medical necessity as they affect public-record rules at least suggest the possibility that WPATH is medicalizing its advocacy.

And even WPATH's method of identifying candidates for SRS—the method we describe and effectively endorse today—is very much contestable. A leading article (admittedly ten years old at this point, but still oft cited), concluded on this topic that "[u]nfortunately, studies evaluating the indispensability of components of the currently employed procedures are nonexistent." Cohen-Kettenis & Gooren, *supra* at 325.

II.

The majority reasons that O'Donnabhain's hormone therapy and SRS treat a disease, and so their costs are deductible expenses of medical care. It then adds a coda to the opinion holding that these treatments are "medically necessary." Majority op. p. 76.

A.

The best way of framing the question of deductibility is to view the medical-expense provisions in the Code as creating a series of rules and exceptions. Section 262(a) creates a general rule that personal expenses are not deductible. Section 213(a) and (d)(1) then creates an exception to the general rule for the expenses of medical care if they exceed a particular percentage of adjusted gross income. Section 213(d)(9) then creates an exception to the exception for cosmetic surgery. And section 213(d)(9)(A) then creates a third-order exception restoring deductibility for certain types of cosmetic surgery.

To show how this works in practice, consider reconstructive breast surgery after a mastectomy. This is a personal expense (i.e., not incurred for profit, in a trade or business, etc.). But such surgery affects a "structure of the body" under

section 213(d)(1) and so is "medical care." But it's presumptively "cosmetic surgery" under section 213(d)(9)(B) because, as reconstructive surgery, it is "directed at improving the patient's appearance and does not meaningfully promote the proper function of the body or prevent or treat illness or disease." It is nevertheless deductible cosmetic surgery under section 213(d)(9)(A) because it is "necessary to ameliorate a deformity arising from, or directly related to, a * * * disfiguring disease."

I agree with the majority's holding that O'Donnabhain's GID is a disease. Until the collapse of psychiatry into the waiting arms of neurology is complete, courts must of necessity rely on the listing and classification of disorders in the DSM.[3] But once this point is made, we need not go further into a discussion of the proper standards of care or opine on their effectiveness. Our precedent, as the majority correctly points out, allows for the deductibility of treatments that are highly unlikely to survive rigorous scientific review. See, e.g., *Dickie v. Commissioner*, T.C. Memo. 1999–138 (naturopathic cancer treatments); *Tso v. Commissioner*, T.C. Memo. 1980–399 (Navajo sings as cancer treatment); see also Rev. Rul. 55–261, 1955–1 C.B. 307, 307 (services of Christian Science practitioners) (subsequent modifications irrelevant). The key question under section 213(d)(1) is whether the treatment is therapeutic to the individual involved. See *Fischer v. Commissioner*, 50 T.C. 164, 174 (1968).

This is essentially a test looking to the good-faith, subjective motivation of the taxpayer. There is no doubt that O'Donnabhain meets it with regard to her hormone therapy and SRS.

---

[3] The fluidity of changes in the DSM from edition to edition suggests that the nosology of mental disorders is far from being as precise as, for example, the nosology of diseases caused by bacteria or vitamin deficiencies. I'm therefore somewhat sympathetic to, if ultimately unpersuaded by (because of the great weight of precedent), the Commissioner's effort to change our interpretation of "disease" in section 213 to mean only maladies with a demonstrated organic cause.

I must, however, note the Commissioner's alternative argument that "negative myths and ignorance that permeate social thinking in the United States regarding transgendered persons" and the "many laws and legal situations [that] are highly discriminatory for persons with GID" mean that the "suffering experienced by GID patients is primarily inflicted by an intolerant society." Resp. Br. at 172–73. (At least compared to the "elevated status" of the Berdache in some Native American cultures, the Kathoey in Thailand, the Indian Hijra, and the Fa'afafine in the South Pacific, as the Commissioner anthropologically concludes. *Id.* at 175.) It is not effective advocacy to denigrate the people whose government one is representing.

B.

1. It is the majority's next step in the analysis—its reading of the definition of cosmetic surgery in section 213(d)(9)(B)—that I cannot join. If it had reasoned simply that to "treat" illness in section 213(d)(9)(B) meant the same low standard that it does in section 213(d)(1)—a subjective good-faith therapeutic intent on the part of the patient—and stopped, we wouldn't be doing anything controversial. In the absence of any regulation, there would be no reason to demur, because as the majority carefully points out, the phrase "medical necessity" is nowhere in the Code. Majority op. p. 74. Nor of course is medical necessity consistent with the liberal construction of section 213 both by us and by the IRS. (The deductibility of Navajo sings and Christian Science prayer did not depend on their medical necessity.) The phrase occurs in only one place, in what is not even the most relevant legislative history. Majority op. note 54.

That should have been enough to dispense with the Commissioner's argument on this point. But the majority tacks on an extra section onto its opinion concluding that SRS and hormone therapy for transsexual persons are "medically necessary." Avoidance would have been the sounder course, because "medically necessary" is a loaded phrase. Construing it puts us squarely, and unnecessarily, in the middle of a serious fight within the relevant scientific community, and the larger battle among those who are deeply concerned with the proper response to transsexual persons' desires for extensive and expensive surgeries.

As the majority thoroughly explains, the theory that SRS is the best—and perhaps the only—treatment for GID has been extensively promoted. Dr. Brown, O'Donnabhain's expert witness, summed up the theory—SRS is medically necessary to "cure or mitigate the distress and maladaption caused by GID." Majority op. p. 43. For governments or insurers to exclude coverage thus becomes perceived as discrimination or an unjust deference to stereotypes of transsexual persons. Acceptance of SRS as medically necessary has become a cause not only for those with GID, but for a wider coalition as well. See Jeffreys, *supra*.

Our discussion of the science is, though, weak even by the low standards expected of lawyers. Tucked into a footnote is

our opinion on the relative merits of the scientific conclusions of Dr. Brown (O'Donnabhain's witness in favor of the medical necessity of SRS) and Dr. Schmidt (the Commissioner's witness who was opposed). Majority op. note 56. The reasoning in that footnote in favor of Dr. Brown's opinion is that he is more widely published than Dr. Schmidt. But Dr. Schmidt was chair of the Sexual Disorders Work Group that drafted part of the DSM–IV on which the majority relies, and is a longtime psychiatry professor at Johns Hopkins and a founder of its Sexual Behavior Consultation Unit. (I think it fair to take judicial notice that Johns Hopkins is a well-regarded medical institution.)

The majority also criticizes Dr. Schmidt for citing a religious publication. See majority op. note 47. It's true that one of the sources Dr. Schmidt cited was an article by the former chairman of Johns Hopkins' Psychiatry Department in *First Things*. But it is inadequate, if we're going to weigh in on this debate, to imply that Johns Hopkins' conclusion was based merely on an essay in "a religious publication."

*First Things,* like *Commentary* and a host of other general-interest but serious periodicals, seeks out the small subset of specialists who can write well.[4] Essays by such people don't aspire to be original research, but they are often based on original research. And so was the *First Things* article by Dr. McHugh, which summarized the research of a third member of the Hopkins Psychiatry Department, Dr. Jon Meyer. Meyer & Reter, "Sex Reassignment," 36 Archives Gen. Psychiatry 1010 (1979). In the study, Dr. Meyer followed up with former Johns Hopkins Gender Identity Clinic patients. Unlike authors of previous studies, Meyer included both unoperated GID patients and post-SRS patients in his study— allowing him to compare the well-being of the operated and unoperated patients. Using patient interviews, he issued initial and followup adjustment scores for both the operated and unoperated patients. Both the operated and unoperated subjects' mean scores improved after the followup period, but there was no significant difference between the improvement

---

[4] It is not quite accurate to label *First Things*, any more than *Commentary*, a "religious publication" given the breadth of the subject matter and lack of sectarian slant in what it publishes. Dr. Schmidt could've just as easily cited the same conclusion by the same author in an essay in *The American Scholar*. McHugh, "Psychiatric Misadventures," Am. Scholar 497 (1992). (*The American Scholar* is "untainted" by any connection with religion.)

of each group. The operated group failed to demonstrate clear objective superiority over the unoperated group—in other words, SRS didn't provide any objective improvement to the GID patients.

There are numerous other clues that the picture of scientific consensus that the majority presents is not quite right. Consider where the surgeries are currently performed. SRS was for many years primarily undertaken in research hospitals that had "gender identity clinics."[5] These clinics would conduct research on SRS and evaluate its effectiveness. Johns Hopkins, under the leadership of Dr. John Money,[6] opened the first U.S. gender identity clinic in 1965. Money & Schwartz, "Public Opinion and Social Issues in Transsexualism: A Case Study in Medical Sociology," in Transsexualism and Sex Reassignment 253 (Green & Money eds., 1969). After Johns Hopkins took the lead, other university-based clinics jumped at the opportunity to research transsexualism and perform SRS.[7] But the first research clinic to perform and study SRS was also the first to cut it off. The Meyer study had found no significant difference in adjustment between those who had SRS and those who didn't, and in light of that study Johns Hopkins announced in 1979 that it would no longer perform SRS. "No Surgery for Transsexuals," Newsweek, Aug. 27, 1979, at 72. After the Hopkins clinic closed, the other university-based clinics either closed or ended their university affiliations. Denny, *supra*. Stanford, for example, in 1980 spun off its university-affiliated clinic to a private center that performed SRS but didn't conduct research. Levy, "Two Transsexuals Reflect on University's Pioneering Gender Dysphoria Program," Stanford Rep., May 3, 2000.

---

[5] For an overview of the gender clinics, see Denny, "The University-Affiliated Gender Clinics, and How They Failed to Meet the Needs of Transsexual People," Transgender Tapestry #098, Summer 2002, available at http://www.ifge.org/Article59.phtml (last visited Jan. 7, 2010).

[6] Dr. Money was extremely influential in gender identity studies. See Witte, "John Money; Helped Create Studies on Gender Identity," Associated Press, July 10, 2006, *available at* http://www.boston.com/news/globe/obituaries/articles/2006/07/10/john_money_helped_create_studies_on_gender_identity/ (last visited Jan. 7, 2010). But there is now a consensus that some of his most noteworthy work was unethical, and in some respects fraudulent. See Colapinto, "The True Story of John/Joan," Rolling Stone, Dec. 11, 1997, at 54; Kipnis & Diamond, "Pediatric Ethics and the Surgical Assignment of Sex," 9 J. Clinical Ethics 398 (Winter 1998).

[7] The University of Minnesota, UCLA, Vanderbilt, UVA, Stanford, and Duke were among the more prominent university-based gender identity clinics conducting research. Denny, *supra* note 5.

Eventually, all university-based research clinics stopped the practice of SRS.[8] *Id.* Today, SRS in the United States is primarily the purview of a few boutique surgery practices. While such surgeons—including O'Donnabhain's—are undoubtedly skilled in their art, they do not have the capacity to conduct research on the medical necessity of SRS like the research hospitals. Their practices use the Benjamin standards, but do not seem to conduct peer-reviewed studies of their efficacy.

It is true that the Meyer piece has been the subject of lively controversy,[9] but it is certainly the case that it prompted Hopkins to get out of the SRS business; and over the next few years every other teaching hospital also left the field. Denny, *supra*. If we needed to opine on the medical necessity of SRS, some sensitivity to that academic controversy, particularly the problem of how to set up a proxy control group for those undergoing sex reassignment, as well as some sensitivity to defining and measuring the effectiveness of surgery, would have to be shown. I do not believe we should have addressed the issue.[10]

2. There is, however, a related cluster of problems that judges and lawyers have had to solve—questions of the medical necessity of SRS in:

• Eighth Amendment prisoner cases;
• ERISA litigation; and
• Medicaid and Medicare reimbursement.

------

[8] Some research hospitals, Stanford among them, will perform SRS on a referral basis—but the clinical research on SRS at these hospitals has been shut down. Levy, "Two Transsexuals Reflect on University's Pioneering Gender Dysphoria Program," Stanford Rep., May 3, 2000.

[9] There has been at least one study that reached a different conclusion using a somewhat similar methodology. See Mate-Kole et al., "A Controlled Study of Psychological and Social Change After Surgical Gender Reassignment in Selected Male Transsexuals," 157 Brit. J. Psychiatr. 261 (1990). There have also been numerous studies without controls (or the sort of quasi-controls that Meyer used) that report transsexual persons generally satisfied with the results of SRS. Such studies are as problematic as would be drug studies without double-blind control groups. The question is further complicated by the possibility that different types of transsexuals, see Blanchard, "Typology of Male-to-Female Transsexualism," 14 Archives Sexual Behav. 247 (1985), will experience different outcomes; as might female-to-male transsexuals compared to male-to-female transsexuals. See generally Cohen-Kettenis & Gooren, *supra* at 326–28.

My point is not to pick Meyer over Mate-Kole, but only to suggest the problem is much more complicated than the majority lets on. It is certainly beyond the competence of tax judges.

[10] The feelings on both sides may cause the controversy to slip out of science altogether and land in the politics of the APA as it prepares the next edition of the DSM. See Carey, "Psychiatry's Struggle to Revise the Book of Human Troubles," N.Y. Times, Dec. 18, 2008, at A1 (describing petition campaigns to affect membership of drafting group, and disputes among transgendered persons about whether GID should even be classified as a disorder).

The majority correctly cites the decisions of seven circuit courts that have concluded GID constitutes a "serious medical need" for purposes of the Eighth Amendment. Majority op. p. 62. While confirming that GID is a "profound psychiatric disorder," see, e.g., *Maggert v. Hanks*, 131 F.3d 670, 671 (7th Cir. 1997), no circuit court has in this area held that SRS— or even the less-invasive hormone therapy—is a "medically necessary" treatment for GID. At least one has even emphasized that there is no right to "any particular type of treatment, such as estrogen therapy." *Meriwether v. Faulkner*, 821 F.2d 408, 413 (7th Cir. 1987) (citing *Supre v. Ricketts*, 792 F.2d 958 (10th Cir. 1986), in which the court refused to hold that a prison's decision not to provide a self-injuring prisoner with estrogen violated the Eighth Amendment as long as some form of treatment for GID was provided); *Lamb v. Maschner*, 633 F. Supp. 351 (D. Kan. 1986) (finding prison officials were not constitutionally required to provide prisoner with specific treatment requested of hormones and SRS). Judge Posner's summary of the GID-prisoner cases is instructive:

Does it follow that prisons have a duty to administer (if the prisoner requests it) * * * [SRS] to a prisoner who unlike Maggert is diagnosed as a genuine transsexual? The cases do not answer "yes," but they make the question easier than it really is by saying that the choice of treatment is up to the prison. The implication is that less drastic (and, not incidentally, less costly) treatments are available for this condition. * * *

*Maggert*, 131 F.3d at 671 (citations omitted).

The medical necessity of SRS shows up in ERISA litigation as well. See, e.g., *Mario v. P & C Food Mkts., Inc.*, 313 F.3d 758 (2d Cir. 2002). Mario, a female-to-male transsexual, sued for reimbursement of the cost of his sex-reassignment surgery from his employer's ERISA-governed health insurance plan. The plan administrator denied his claim for lack of medical necessity based on an investigation that included the following:

[r]esearch on the issue of transsexualism, inquiry into the policies of other employers and insurance carriers concerning coverage of gender reassignment procedures, consultation with medical centers having specialized knowledge of transsexualism and sexual reassignment surgeries, and consultation with medical personnel employed by [the plan administrator], including a psychiatrist retained by [the plan administrator], Dr. Ivan Fras. Dr. Fras opined that the surgical removal of healthy organs, for no

purpose other than gender dysphoria, would fall into the category of cosmetic surgery, and would therefore not be "medically necessary." On the basis of her investigation, * * * [the plan administrator employee] concluded that there was substantial disagreement in the medical community about whether gender dysphoria was a legitimate illness and uncertainty as to the efficacy of reassignment surgery. * * *

*Id.* at 765–66. The plan administrator's SRS-lacks-medical-necessity conclusion survived *de novo* review by the Second Circuit.

Medicare's administrator—The Centers for Medicare and Medicaid Services—has weighed in on the issue by denying reimbursement for SRS on the following basis: [11]

Because of the lack of well controlled, long term studies of the safety and effectiveness of the surgical procedures and attendant therapies for transsexualism, the treatment is considered experimental. Moreover, there is a high rate of serious complications of these surgical procedures. For these reasons, transsexual surgery is not covered.

54 Fed. Reg. 34572 (Aug. 21, 1989).

The legal issues presented in each of these clusters of cases differ from the legal question—are O'Donnabhain's procedures deductible under section 213?—that we face in this case, but I think they illustrate the majority's overreach in finding SRS "medically necessary."

### III.

I do not think that highlighting what I think is the incorrect interpretation of the Code by the majority is enough. O'Donnobhain carefully argued in the alternative, and it is to those alternative arguments that I now turn.

### A.

I start back at the beginning with section 213(d)(1)(A), which defines "medical care" to include not just amounts

---

[11] Some cases hold that states cannot categorically exclude sex-change operations from Medicaid coverage. *Pinneke v. Preisser*, 623 F.2d 546, 549–550 (8th Cir. 1980); *J.D. v. Lackner*, 145 Cal. Rptr. 570 (Ct. App. 1978); *G.B. v. Lackner*, 145 Cal. Rptr. 555 (Ct. App. 1978); *Doe v. Minn. Dept. of Pub. Welfare*, 257 N.W.2d 816 (Minn. 1977). Over time, these decisions have been overtaken by regulation or statute. See, e.g., *Smith v. Rasmussen*, 249 F.3d 755, 760–61 (8th Cir. 2001) (upholding regulation overturning *Pinneke* as reasonable).

Until recently, Minnesota was the only state in which Medicaid paid for SRS. Price, "Minnesota Using Medicaid Funding to Pay for Sex-Change Operations," Wash. Times, Feb. 4, 1996, at A4. But four years ago, it joined the rest of the states. Minn. Stat. Ann. sec. 256B.0625 subd. 3a (West 2007).

paid for the "diagnosis, cure, mitigation, treatment, or prevention or disease," but also amounts paid "for the purpose of affecting any structure or function of the body." The Commissioner actually stipulated that all three procedures O'Donnabhain received that are at issue here—hormone treatment, SRS, and breast augmentation—meet this alternate definition of "medical care." [12]

This should have obviated the need to wade into the disputes about classification, etiology, and diagnosis of O'Donnabhain's GID. The majority does cite one sentence from the applicable regulation for the proposition that medical care is confined to expenses "'incurred primarily for the prevention or *alleviation* of a physical or mental defect or illness.'" Majority op. p. 65 (quoting section 1.213–1(e)(1)(ii), Income Tax Regs.). But that sentence doesn't apply to the second type of medical care—lest it be somehow read to overturn even the IRS's settled opinion that procedures as diverse as abortion, Rev. Rul. 73–201, 1973–1 C.B. 140, vasectomies, *id.*, and face lifts, Rev. Rul. 76–332, 1976–2 C.B. 81, qualify as "medical care" because they affect a structure or function of the body. (That's what the first sentence of section 1.213–1(e)(1)(ii), Income Tax Regs., says. [13])

There is therefore little doubt that the expenses O'Donnabhain incurred qualify as medical care under section 213(d)(1)(A). But are they nondeductible "cosmetic surgery?"

B.

Under section 213(d)(9)(B), it is a necessary condition for characterization as "cosmetic surgery" that a procedure be "directed at improving the patient's appearance." O'Donnabhain urges us to find that her procedures were directed at resolving or reducing the psychological distress at feeling herself trapped in a body of the wrong sex. The Commissioner says that may be true, but the procedures involved obviously changed her appearance.

---

[12] Here's what the Commissioner stipulated: "Petitioner's sex reassignment surgery affected structures or functions of petitioner's body;" "Petitioner's prescription hormone therapy affected structures or functions of petitioner's body;" and "Petitioner's breast augmentation surgery affected structures or functions of petitioner's body."

[13] The sentence quoted by the majority is, in context, aimed at distinguishing expenses aimed directly, rather then remotely, at preventing or alleviating illness. It is immediately followed by a list of expenses that are *per se* medical-care expenses, and which includes surgery and prescription drugs (like hormones) that O'Donnabhain received.

There is no regulation helping us to apply this language; we need to use the traditional judicial tools to do so. This first requires us to parse the meaning of "directed at" and "improving". "Directed at" as a phrase is nowhere else in the Code and is not a specialized legal or tax term, but it has a common meaning of "focused at," or "concentrating on." "Improving" is likewise a word in ordinary use, meaning "to enhance," or "make more desirable." Webster's Third New International Dictionary (1961).

The legislative history of the provision, which the majority quotes, lists some of the procedures that Congress aimed at including in the presumptively nondeductible category:

> under the provision, procedures such as hair removal electrolysis, hair transplants, lyposuction [sic], and facelift operations generally are not deductible. In contrast, expenses for procedures that are medically necessary to promote the proper function of the body and only incidentally affect the patient's appearance or expenses for the treatment of a disfiguring condition arising from a congenital abnormality, personal injury or trauma, or disease (such as reconstructive surgery following removal of a malignancy) continue to be deductible * * *.

Majority op. note 27. The list isn't in the Code itself, so it's not quite right to hold we must apply the maxim of *ejusdem generis,* but it is helpful in suggesting the meaning of the key words that did make it into law. Without more specific guidance from the Secretary in the form of a regulation, I would conclude that "directed at improving" reflects two concepts. The first is that the subjective motivation of the patient (his "focus") is important, and it is his primary motivation that is most important. The second is that the notion of "improving" suggests a baseline from which something is improved—all the procedures in the committee's list are those commonly recognized by the average observer in our society as improving appearance in a way that a biological man's taking female hormones and undergoing extensive genital surgery do not. (I also concur with the majority that the breast surgery did not "treat disease.")

I therefore end up in the same place as the majority. O'Donnabhain's hormone treatment and SRS established a biological baseline of a new sexual appearance for her. It was, of course, foreseeable, and she intended, to change her appearance. But I also agree with her (as the majority does) that her *purpose* was to relieve the pathological anxiety or

distress at being biologically male (or, alternatively, at not feeling masculine). Majority op. note 52. Hormones and SRS are, I would hold as a general matter in such cases, directed at treating GID in this sense and do not so much improve appearance as create a new one.

But the breast-augmentation surgery is different. O'Donnabhain's new baseline having been established through hormones, I would hold that that surgery was directed at improving—in the sense of focused on changing what she already had—her already radically altered appearance. Denying the deduction for this procedure while allowing it for the hormones and SRS also seems a reasonable distinction—breast surgery is likely one of the commonest types of cosmetic surgery and (if not undergone after cancer surgery or trauma or the like) highly likely to be within the common public meaning of that phrase.

That leaves only the question of whether O'Donnabhain's breast-augmentation surgery meets one of the exceptions to the nondeductibility of cosmetic surgery listed in subsection (d)(9)(A). This is easy—O'Donnabhain never argued her breasts were deformed by "a congenital abnormality, a personal injury resulting from an accident or trauma, or disfiguring disease."

I therefore respectfully concur with majority's result, if not its reasoning.

GOEKE, *J.*, agrees with this concurring opinion.

––––––––––––

GOEKE, *J.*, concurring in the result only: Although I concur in the result reached by the majority, I respectfully disagree with the majority's analysis of section 213.

"Whether and to what extent deductions shall be allowed depends upon legislative grace; and only as there is clear provision therefor can any particular deduction be allowed." *New Colonial Ice Co. v. Helvering*, 292 U.S. 435, 440 (1934). As a general rule, "personal, living, or family expenses" are not deductible. Sec. 262. As an exception to that general rule petitioner relies on section 213, which allows a deduction for "expenses paid * * * for medical care". Section 213(d)(1)(A) defines deductible "medical care" to include "the diagnosis, cure, mitigation, treatment, or prevention of disease, or for

the purpose of affecting any structure or function of the body". We have consistently construed the medical expense deduction "narrowly" for over 40 years. *Atkinson v. Commissioner*, 44 T.C. 39, 49 (1965); *Magdalin v. Commissioner*, T.C. Memo. 2008–293. This case turns on whether petitioner's claimed deductions are barred by the exclusion in section 213(d)(9). If medical deductions are construed narrowly, it follows that statutory exclusions from medical deduction should be construed broadly.

This case presents the question whether the cost of surgery to alter nondisfigured, healthy tissue is deductible when the surgery is performed to address a mental disorder or disease.

Section 213(d)(9) provides:

(9) COSMETIC SURGERY.—

(A) IN GENERAL.—The term "medical care" does not include cosmetic surgery or other similar procedures, unless the surgery or procedure is necessary to ameliorate a deformity arising from, or directly related to, a congenital abnormality, a personal injury resulting from an accident or trauma, or disfiguring disease.

(B) COSMETIC SURGERY DEFINED.—For purposes of this paragraph, the term "cosmetic surgery" means any procedure which is directed at improving the patient's appearance and does not meaningfully promote the proper function of the body or prevent or treat illness or disease.

The majority opinion relies on two of the last four words to the exclusion of the rest of section 213(d)(9)(B) in allowing a deduction for petitioner's genital surgery by concluding that petitioner suffered from a "disease" and that the genital surgery in question "[treated]" that disease.

The definition of "cosmetic surgery" in subparagraph (B) begins with surgery "directed at improving the patient's appearance". The transformation of petitioner's genitals was not directed at improving petitioner's appearance but rather was functional. The authorities cited in the majority opinion for the proposition that genital surgery to treat GID is not cosmetic surgery support this conclusion. See, e.g., *White v. Farrier*, 849 F.2d 322 (8th Cir. 1988). Given the factual findings supporting the medical purpose of such surgery, it is therefore deductible as medical care under section 213(a) and is not excluded by section 213(d)(9) because it is not cosmetic surgery. On that basis I concur in the majority's allowing petitioner a deduction for genital surgery.

Having concluded that petitioner's genital surgery is not cosmetic, I would reject the notion that it is nevertheless excluded as a "similar [procedure]" under section 213(d)(9)(A). Such a reading would negate the import of the definition of cosmetic surgery in subparagraph (B). Rather, I believe "similar procedures" in subparagraph (A) refers to procedures directed at improving appearance that are not necessarily considered surgical. Accordingly, petitioner's hormone therapy is not a similar procedure under section 213(d)(9)(A) because it was in support of petitioner's genital surgery and was not directed at improving petitioner's appearance. On the other hand, Botox injections would be an example of a similar procedure in my view.

I disagree with the majority opinion because it leaves open the possibility that expenses for surgery directed solely at altering physical appearance may nevertheless be deductible if it is intended to alleviate mental pain and suffering. I do not read the word "treat" in the context of section 213(d)(9)(B) to include physically altering a patient's appearance to relieve extreme mental distress. Therefore, I would hold that the breast surgery is excluded "cosmetic surgery" under section 213(d)(9) as a matter of law, and to this extent I agree with Judge Gustafson's concurring in part and dissenting in part opinion.

I would read the statute in conformity with the legislative history. I believe that the word "treat" in the context of the cosmetic surgery exclusion implies that for expenses for any procedure to be deductible, the procedure must address a physically related malady. If surgery to relieve mental suffering without a physical nexus is deductible, a line is crossed from physical to mental treatment. A court should not cross that line in applying section 213. Any expansion of the medical expense deduction should be addressed by Congress because it is not clear that surgery which does not address a physical condition is deductible under section 213(d)(9).

The majority holds that the line on deductibility for mental conditions has been crossed in general and that evolving mental diagnoses are considered diseases for purposes of section 213(d)(1)(A). I think this argument overlooks the nature of the exclusion in paragraph (9). The standard for deductibility under section 213(d)(1)(A) is inherently more generous

than that in subsection (d)(9). Congress enacted section 213(d)(9) in response to IRS interpretations of "medical care" as including procedures that permanently altered any structure of the body even if the procedure was considered to be an elective, purely cosmetic treatment. As the majority points out, majority op. note 27, the impetus for section 213(d)(9) was the Senate. The Senate Finance Committee report stated:

under the provision, procedures such as hair removal electrolysis, hair transplants, lyposuction [sic], and facelift operations generally are not deductible. In contrast, expenses for procedures that are medically necessary to promote the proper function of the body and only incidentally affect the patient's appearance or expenses for the treatment of a disfiguring condition arising from a congenital abnormality, personal injury or trauma, or disease (such as reconstructive surgery following removal of a malignancy) continue to be deductible * * *.

There is no indication that the exclusion of surgery directed at improving appearance omits surgery related to helping a person feel differently about himself or herself even if such a change in feelings relieves mental suffering. The above-quoted language from the Senate Finance Committee report indicates that Congress intended to allow deductions only for cosmetic surgery to correct physical maladies resulting from disease or physical disfigurement, as opposed to cosmetic surgery on healthy tissue. The report uses "malignancy" as an example of a disease which can cause a deformity requiring cosmetic surgery which would be deductible.

Accepting that the alteration of physical appearance can be a remedy to address a mental illness, the question remains whether deductions for such treatment are barred by a specific legislative mandate. I would hold that the breast surgery in this case is not medically necessary as that term is applied in deciding whether an expense is excluded under section 213(d)(9). The nuances of feminine appearance are virtually without bounds, and expenses for efforts to conform petitioner's entire body to a feminine ideal are indistinguishable from excluded expenses regardless of petitioner's mental health.

In other contexts there is little question that deductions for breast augmentation or facial reconstruction surgery apart from physical disease or disfigurement or physical abnormality would be barred by section 213(d)(9). The issue is

whether Congress intended to allow deductions for those surgeries if done to relieve a mental disease or illness. I remain unconvinced that Congress intended to permit deductions for such surgery directed at appearance and not directed at physical disfigurement or physical dysfunction or physical disease. To accept that deductibility is possible under different facts is to entertain that all forms of cosmetic surgery will be deductible medical expenses if the surgery addresses or relieves mental suffering caused by a recognized mental disorder. I do not agree that the statute read in its entirety permits such deduction.

HOLMES, *J.*, agrees with this concurring in the result only opinion.

---

FOLEY, *J.*, concurring in part [1] and dissenting in part: Preoccupied with establishing whether gender identification disorder (GID) is a disease, respondent and the majority fail to correctly explicate and apply the statute. In allowing deductions relating to petitioner's expenses, the majority has performed, on congressional intent, interpretive surgery even more extensive than the surgical procedures at issue—and respondent has dutifully assisted. This judicial transformation of section 213(d)(9) is more than cosmetic.

I. *The Majority Does Not Adhere to the Plain Language of Section 213(d)(9)*

Section 213(d) provides in part:

(9) COSMETIC SURGERY.—

(A) IN GENERAL.—The term "medical care" does not include cosmetic surgery or other similar procedures, unless the surgery or procedure is necessary to ameliorate a deformity arising from, or directly related to, a congenital abnormality, a personal injury resulting from an accident or trauma, or disfiguring disease.

(B) COSMETIC SURGERY DEFINED.—For purposes of this paragraph, the term "cosmetic surgery" means any procedure which is directed at improving the patient's appearance and does not meaningfully promote the proper function of the body *or* prevent or treat illness or disease. [Emphasis added.]

---

[1] I concur with the majority's conclusion that petitioner's breast augmentation surgery is "cosmetic surgery" but disagree with the majority's reasoning (i.e., conclusion that failure to strictly adhere to the Benjamin standards constitutes failure to "treat" gender identification disorder) and interpretation of the statute.

The majority states that section 213(d)(9)(B) *"excludes* from the definition any procedure" (emphasis added) that promotes bodily function or treats a disease. See majority op. p. 52. The statutory definition, however, prescribes what is included, not excluded, from the definition of cosmetic surgery. The statute sets forth a two-part test: a procedure is cosmetic surgery if it (1) is directed at improving appearance and (2) does not meaningfully promote proper bodily function *or*[2] prevent or treat illness or disease. Part two of the test is disjunctive, not conjunctive. A procedure "directed at improving the patient's appearance" is cosmetic surgery if it either does not "meaningfully promote the proper function of the body" *or* does not "prevent or treat illness or disease." Thus, if petitioner's procedures are "directed at improving * * * appearance" and "[do] not meaningfully promote the proper function of the body", they are cosmetic surgery without regard to whether they treat a disease. The majority does not address either of these prongs but, instead, asserts that these prongs are irrelevant if the procedures treat a disease. See majority op. note 30.

The majority's analysis proceeds as if the statute employs "and" rather than "or" between the "meaningfully promote the proper function of the body" and "prevent or treat illness or disease" prongs. Respondent appears to agree with this interpretation in lieu of a plain reading of the statute. In essence, the majority and respondent engage in reconstruction, rather than strict construction, of section 213(d)(9). According to their interpretation, a procedure will be treated as cosmetic surgery only if it meets all three prongs (i.e., it is directed at improving appearance, does not promote proper bodily function, *and* does not prevent or treat illness or disease).

Simply put, the fact that a procedure treats a disease is not sufficient to exclude the procedure from the definition of "cosmetic surgery". Indeed, to adopt the majority's reasoning and its accompanying conclusion the Court must ignore that Congress in section 213(d)(9)(A) specifically provides that the term "medical care" will include "cosmetic surgery or other

---

[2] While "use of the conjunctive 'and' in a list means that all of the listed requirements must be satisfied * * * use of the disjunctive 'or' means that only one of the listed requirements need be satisfied." Kim, Statutory Interpretation: General Principles and Recent Trends 8 (CRS Report for Congress, updated Aug. 31, 2008).

similar procedures" if the "surgery or procedure is necessary to ameliorate a deformity arising from, or directly related to, a * * * disfiguring *disease*." (Emphasis added.) If any procedure that treats a disease (i.e., as the majority broadly interprets that phrase), see majority op. p. 65, is automatically carved out from the definition of cosmetic surgery, then the section 213(d)(9)(A) specific exclusion, relating to procedures that ameliorate a deformity arising from a disfiguring disease, is superfluous. See *TRW Inc. v. Andrews*, 534 U.S. 19, 31 (2001) (stating that it is "'a cardinal principle of statutory construction' that 'a statute ought, upon the whole, to be so construed that, if it can be prevented, no clause, sentence, or word shall be superfluous, void, or insignificant.'" (quoting *Duncan v. Walker*, 533 U.S. 167, 174 (2001))). Congress in section 213(d)(9)(A) readily acknowledges that certain procedures which treat disease may be cosmetic and ensures that these procedures will nevertheless be deemed medical care if they ameliorate a deformity. Sex reassignment surgery (SRS) and the accompanying procedures did not make the list.

Judge Halpern asserts that this analysis "disregards the rules of grammar and logic" and that De Morgan's laws dictate the majority's holding. Halpern op. p. 83. If there is a negation of the conjunction "or", De Morgan's laws convert "or" to "and". Judge Halpern's mechanical application of De Morgan's laws is not prudent. Simply put, congressional intent is not subservient to De Morgan's laws. Courts dealing with statutes that contain the negation of a conjunction have employed interpretive principles to ensure adherence to Congress' plain language.[3] In short, section 213(d)(9) must be

---

[3] This tension between Congress' plain language and De Morgan's laws was evident in the interpretation of a property forfeiture statute which contained the negation of a conjunction (i.e., "without the knowledge or consent"). See 21 U.S.C. sec. 881(a)(7) (1988); *United States v. 171–02 Liberty Ave.*, 710 F. Supp. 46 (E.D.N.Y. 1989); cf. *United States v. 141st Street Corporation*, 911 F.2d 870 (2d Cir. 1990). Rather than applying De Morgan's laws and interpreting the statutory language to mean "without the knowledge and without the consent", the District Court followed legislative intent, adhered to a plain reading, and interpreted the language to mean "without the knowledge *or without the consent*". *United States v. 171–02 Liberty Ave.*, *supra* at 50. The court held:

Under normal canons of statutory construction, the court must give effect to Congress' use of the word "or" by reading the terms "knowledge" and "consent" disjunctively. * * *

* * * If Congress had meant to require a showing of lack of knowledge in all cases, as suggested by the Government, it could have done so by replacing "or" with "and." * * * [*Id.*]

To apply De Morgan's laws and ignore the plain language of the statute would have been imprudent because, as one commentator accurately opined, "we have no way of telling whether the drafters of the statute intended that De Morgan's Rules apply or not". Solan, The Language of

interpreted with cognizance of the fact that this section was enacted by a Congress intent on limiting deductions for procedures directed at improving appearance and that Augustus De Morgan was not a member of the 101st Congress.

## II. *The Legislative History Provides No Support for the Deduction of Petitioner's Expenses*

The lack of unanimity among my colleagues may suggest that section 213(d)(9) is ambiguous and thus resort to legislative history may be appropriate. See *Anderson v. Commissioner*, 123 T.C. 219, 233 (2004), affd. 137 Fed. Appx. 373 (1st Cir. 2005). The sparse legislative history accompanying the enactment of section 213(d)(9) is quite illuminating. There is certainly no indication that Congress sought to preserve a deduction for expenses relating to SRS and the accompanying procedures. To the contrary, the legislative history states that Congress intended to preserve deductions relating to:

expenses for procedures that are *medically necessary to promote the proper function of the body* and *only incidentally affect the patient's appearance* or expenses for *treatment of a disfiguring condition* arising from a congenital abnormality, personal injury or trauma, or disease (such as reconstructive surgery following removal of a malignancy) * * *. [136 Cong. Rec. 30485, 30570 (1990); emphasis added.]

Expenses relating to SRS and the accompanying procedures again did not make the list.

## III. *Even If Not Cosmetic Surgery, Petitioner's Procedures May Be "Similar" to Cosmetic Surgery*

Section 213(d)(9)(A) provides that "The term 'medical care' does not include cosmetic surgery or *other similar procedures*, unless the surgery or procedure is necessary to ameliorate a deformity arising from, or directly related to, a congenital abnormality, a personal injury resulting from an accident or trauma, or disfiguring disease." (Emphasis added.) Assuming arguendo that the majority's analysis of section 213(d)(9)(B) is correct, petitioner must nevertheless establish that SRS and the accompanying procedures are not "similar" to cos-

---

Judges 45, 52 (1993). See generally *id.* at 45–46, 49–53 (discussing how courts have dealt with statutes containing the negation of "and" and "or").

metic surgery. The majority does not expound on this issue but states:

> by arguing that the hormone therapy was directed at improving petitioner's appearance and did not treat an illness or disease, *respondent concedes* that a "similar procedure" as used in sec. 213(d)(9)(A) is delimited by the definition of "cosmetic surgery" in sec. 213(d)(9)(B)—that is, that a "similar procedure" is excluded from the definition of "medical care" if it "is directed at improving the patient's appearance and does not meaningfully promote the proper function of the body or prevent or treat illness or disease". [Majority op. note 31; emphasis added.]

This analysis of the statute is simply wrong. The term "similar procedures" is *not* "delimited by the definition of 'cosmetic surgery' in sec[tion] 213(d)(9)(B)". While it is arguable that it could be defined in this manner, that is not what the statute provides. "Cosmetic surgery" is defined in section 213(d)(9)(B), but there is no statutory or regulatory guidance regarding what constitutes "similar procedures". Respondent, who has the authority to promulgate guidance defining "similar procedures" and has broad latitude regarding his litigation position, inexplicably conceded this issue with respect to the hormone therapy treatment and apparently failed to make this contention with respect to the SRS.

Section 213(d)(9)(B) provides a potentially broad disallowance of expenses relating to procedures intended to improve a taxpayer's appearance—a disallowance so broad that Congress provided exceptions set forth in section 213(d)(9)(A) to ensure that certain procedures which address deformities were deemed medical care. The parties have stipulated that petitioner's procedures did not ameliorate a deformity. Even if SRS and the accompanying procedures fail to meet the definition of "cosmetic surgery", it is arguable that these procedures are "similar" to cosmetic surgery, not "medical care", and thus not deductible.

## IV. *Congressional Activity, Rather Than Respondent's Litigation Laxity, Should Determine Deductibility*

Apparently respondent, but not Congress, readily concedes that a procedure (i.e., directed at improving appearance but not meaningfully promoting proper bodily function) is excluded from the definition of cosmetic surgery if it treats

a disease. In addition, respondent, but not Congress, appears to concede that if petitioner's procedures fail to meet the definition of cosmetic surgery, these procedures *also* fail to qualify as "similar procedures". See majority op. note 31. In short, respondent fails to adhere to the plain meaning of the statute. If respondent is comfortable, however, with his current interpretation of the statute and the accompanying litigating position, I offer a word of advice—"Katy, bar the door!"

WELLS, VASQUEZ, KROUPA, and GUSTAFSON, *JJ*., agree with this concurring in part and dissenting in part opinion.

———————————

GUSTAFSON, *J*., concurring in part and dissenting in part: I concur with the result of the majority opinion to the extent that it disallows a medical care deduction under section 213 for breast enhancement surgery, but I dissent to the extent that the majority allows a deduction for genital sex reassignment surgery.

Petitioner is the father of three children from a marriage that lasted 20 years. Although physically healthy, he was unhappy with his male anatomy and became profoundly so, to the point of contemplating self-mutilation. Mental health professionals diagnosed him as suffering from Gender Identity Disorder (GID). With their encouragement, he received medical procedures: In years before the year at issue here, he received injections of female hormones[1] and underwent facial surgery and other plastic surgery; and then in the year at issue he paid a surgeon about $20,000 to remove his genitals, fashion simulated female genitals, and insert breast implants. After these procedures, petitioner "passed" as female and became happier. She[2] claimed an income tax deduction for the cost of this "sex reassignment surgery" (SRS). The question in this case is whether section 213 allows this deduction.

———————————

[1] In the year at issue petitioner received $382 of hormone injections. The majority allows that deduction along with the deduction for genital sex reassignment surgery. I assume that the hormone injections are "similar" to cosmetic surgery and should therefore be disallowed under section 213(d)(9)(A), but I do not further address this de minimis deduction.

[2] Consistent with petitioner's preference, I use feminine pronouns to refer to petitioner in her post-SRS state. However, this convention does not reflect a conclusion that petitioner's sex has changed from male to female.

## I. *Non-issues*

The surgical procedures involved in this case are startling, and to avoid distraction from the actual issues, it is expedient to affirm what is *not* at issue here: Neither the tax collector nor the Tax Court sits as a board of medical review, as if it were reconsidering, validating, or overruling the medical profession's judgments about what medical care is appropriate or effective for what medical conditions. Likewise, neither the tax collector nor the Tax Court passes judgment on the ethics of legal medical procedures, since otherwise deductible medical expenses are not rendered non-deductible on ethical grounds. See, e.g., Rev. Rul. 73–201, 1973–1 C.B. 140 (cost of legal abortion held deductible under section 213).

Rather, we decide only a question of deductibility for income tax purposes. In section 213 Congress created a deduction for "medical care", thereby implicitly but necessarily importing into the Internal Revenue Code principles that rely in part on the judgments of the medical profession. Medical care that is given pursuant to medical consensus might later prove to have been unfortunate or even disastrous (such as thalidomide prescribed for morning sickness); but an eventual discovery that the care was ill advised would not affect the deductibility of that care for income tax purposes. To determine deductibility under section 213, we determine whether a procedure is "medical care" (as defined in that statute), not whether we would or would not endorse it as appropriate care. Neither the IRS nor the Tax Court was appointed to make such medical endorsements.

Consequently, I accept the majority's conclusions, based on expert medical testimony describing medical consensus,[3] that GID is a serious mental condition, that petitioner suffered from it, that the medical consensus favors SRS for a GID patient like petitioner, that SRS usually relieves the patient's suffering to some significant extent, and that SRS was prescribed to and performed on petitioner in accord with prevailing standards of medical care.

---

[3] The majority opinion acknowledges that in the psychiatric community there is a minority view that SRS is unethical and not medically necessary. Majority op. note 47 (citing testimony referring to Paul McHugh, "Surgical Sex", First Things (November 2004), http://www.firstthings.com/index.php (online edition)); majority op. p. 70; see also Holmes op. pts. I.B and II.B. However, if psychiatry has an intramural dispute about SRS, it will not be arbitrated by persons trained in tax law.

However, Congress did not cede to doctors the authority to grant tax deductions. As the majority acknowledges, majority op. p. 56, medical experts do not decide the interpretation of the terms in section 213. Rather, statutory interpretation is the domain of the courts. Although informed by medical opinion on the medical matters pertinent to medical expertise, the Court alone performs the judicial task of determining the meaning of a statute and applying it to the facts of the case before us, on the basis of the record before us. My disagreement with the majority concerns the interpretation and application of section 213(d)(9), by which Congress deliberately denied deductibility for "cosmetic surgery or other similar procedures".

## II. *"[M]edical care", "cosmetic surgery", and "other similar procedures" in section 213*

As a general rule, "personal, living, or family expenses" are not deductible. Sec. 262. As an exception to that general rule, Congress enacted in 1942 a deduction for "expenses paid * * * for medical care", sec. 213(a); but in 1990 Congress carved out (and declared non-deductible) "cosmetic surgery or other similar procedures", sec. 213(d)(9). We decide today whether SRS is deductible "medical care" or instead is non-deductible "cosmetic surgery or other similar procedures". "Whether and to what extent deductions shall be allowed depends upon legislative grace; and only as there is *clear provision* therefor can any particular deduction be allowed." *New Colonial Ice Co. v. Helvering*, 292 U.S. 435, 440 (1934) (emphasis added). This case therefore requires us to determine whether there is "clear provision" for the deduction of SRS expenses. I conclude that section 213 is anything but clear in allowing such a deduction.

### A. *The language of section 213*

The definition of deductible "medical care" in section 213(d)(1)(A) and the definition of non-deductible "cosmetic surgery" in the exception in subsection (d)(9)(B) must be construed in tandem. The subsection reads in part as follows (emphasis added):

SEC. 213(d). DEFINITIONS.—For purposes of this section—
　(1) The term "medical *care*" means amounts paid—

(A) for the *diagnosis, cure, mitigation, treatment, or prevention* of disease, or for the purpose of affecting any structure or function of the body * * *.

* * * * * * *

(9) COSMETIC SURGERY.—

(A) IN GENERAL.—The term "medical care" does not include cosmetic surgery or other similar procedures, unless the surgery or procedure is necessary to ameliorate a deformity arising from, or directly related to, a congenital abnormality, a personal injury resulting from an accident or trauma, or disfiguring disease.

(B) COSMETIC SURGERY DEFINED.—For purposes of this paragraph, the term "cosmetic surgery" means any procedure which is directed at improving the patient's appearance[4] and does not meaningfully promote the proper function of the body or *prevent or treat* illness or disease.

Thus, in 1942 "medical care" was defined in subsection (d)(1)(A) with two alternative prongs—first, a list of *five* modes of care for disease, i.e., "diagnosis, cure, mitigation, treatment, or prevention";[5] and second, care that "affect[s] any structure or function of the body".

---

[4] Petitioner contends that SRS is *not* "directed at improving the patient's appearance" for purposes of section 213(d)(9)(B); respondent contends that it is; and the majority concludes, majority op. note 30, that it "need not resolve" the issue. On this basis, however, Judge Goeke's concurrence would allow a deduction for the genital SRS because it "was not directed at improving petitioner's appearance but rather was functional." Goeke op. p. 101. His concurrence thus rightly discerns that section 213(d)(9)(B) distinguishes "improving * * * *appearance*" from "promot[ing] * * * proper *function*" (emphasis added); but there is no basis for the conclusion that SRS is "functional". Petitioner's SRS did not involve any attempt to confer female reproductive function. No one undertaking to "promote" sexual "function" would perform a penectomy and a castration on a healthy male body. On the contrary, SRS drastically terminates a male patient's functioning sexuality. SRS did not change petitioner into a "function[ing]" female, but removed his salient male characteristics and attempted to make him resemble a woman—i.e., by petitioner's lights, to "improve[ ] the patient's appearance". The majority shows that the SRS surgeon does try to salvage, as much as possible, some possibility for subsequent sexual response, majority op. p. 41, and observes that SRS "alter[s] appearance (and, *to some degree*, function)", majority op. p. 70 (emphasis added); but the majority makes no finding that petitioner proved that any identifiable portion of the SRS expense can be allocated to restoration of "function". On our record, petitioner's SRS must be said to have been directed at improving appearance rather than promoting function, and it is therefore within the definition of "cosmetic surgery". Judge Holmes's concurrence, on the other hand, attempts no analysis of function versus appearance, but rather proposes a different distinction not explicit in the statute: He would hold that SRS did not "so much *improve* [petitioner's male] appearance as create a *new* [female] one." Holmes op. p. 99 (emphasis added). This ingenious distinction, if accepted, might well undo the disallowance of deductions for cosmetic surgery, since plastic surgery is often marketed and purchased on the grounds that it supposedly creates a "new appearance". But in fact, any surgery that gives the patient a "new appearance" has thereby "improved" the patient's former appearance and is "cosmetic surgery" under section 213(d)(9)(B).

[5] The five terms employed to define "medical care" for income tax purposes in 1942 were borrowed from the definitions of "drug" and "device" added in 1938 to the Federal Trade Commission Act by the Federal Trade Commission Act amendments of 1938, ch. 49, sec. 4, 52 Stat. 114, currently codified at 15 U.S.C. sec. 55(c), (d)(2) (2006). The same five terms currently appear in virtually identical definitions of "medical care" in 29 U.S.C. sec. 1191b(a)(2)(A) (2006) (for

In 1990 the concepts of both these prongs were narrowed in subsection (d)(9)(B) for the purpose of creating a limited exception to the new disallowance of "cosmetic surgery or other similar procedures". That is, appearance-improving procedures were declared to be non-deductible "cosmetic surgery", but the definition given for that term provides a two-prong exception: These appearance-improving procedures are nonetheless deductible under (d)(9)(B) (i.e., are not "cosmetic surgery") if they "meaningfully promote the proper function of the body" (i.e., not if they "affect[ ] any structure or function of the body", as more broadly allowed in (d)(1)(A)) and are nonetheless deductible under (d)(9)(B) if they "prevent or treat" disease (i.e., not if they provide "diagnosis, cure, mitigation, treatment, or prevention of disease", as more broadly allowed in (d)(1)(A)).

Two features of this statutory language that are virtually overlooked in the majority opinion should be noted: First, section 213(d)(9)*(A)* disallows deductions for "cosmetic surgery *or other similar procedures*". (Emphasis added.) That is, expenses for a procedure that falls outside "cosmetic surgery" (as defined in subsection (d)(9)*(B))* may still be disallowed if the procedure is "similar" to "cosmetic surgery". Congress thus enacted this disallowance in such a way that splitting hairs in order to find a procedure not to be within the specific definition of "cosmetic surgery" in (d)(9)(B) may not and should not save the day for its deductibility. Rather, deductibility must be denied under (d)(9)(A) if the non-"cosmetic surgery" procedure is nonetheless "similar" to cosmetic surgery.

Second, assuming that subsection (d)(9)(B) permits deductibility if not both but only one of its prongs is satisfied (i.e., if a procedure only "prevent[s] or treat[s]"), [6] it must be noted

purposes of group health plans under ERISA) and 42 U.S.C. sec. 300gg–91(a)(2) (2006) (for purposes of requirements relating to health insurance coverage). They also appear in definitions of "drug" and "device" in 21 U.S.C. sec. 321(g)(1)(B) and (h)(2) (2006) and in the definitions of "radiologic procedure" and "radiologic equipment" in 42 U.S.C. sec. 10003(2) and (3) (2006). They appear in their verb forms in 42 U.S.C. sec. 247d–6d(i)(7)(A) (2006) (defining "qualified pandemic or epidemic product") and 21 U.S.C. sec. 343(r)(6) (2006) (restricting statements about dietary supplements). They appear as adjectives and gerunds, along with "therapeutic" and "rehabilitative", in 26 U.S.C. sec. 7702B(c)(1) (defining "qualified long-term care services"). Thus, this fivefold list is not unique to the Internal Revenue Code.

[6] The majority (like the parties) interprets subsection (d)(9)(B) to permit deductibility if a procedure does not "meaningfully promote" but does "prevent or treat"; and the majority evaluates the expenses only under that second prong, to determine whether the procedures at issue here
Continued

that this second prong in subsection (d)(9)(B) has only two terms—"prevent" and "treat"—from among the list of five possible modes of "medical care" in subsection (d)(1)(A). I now turn to the significance of that wording.

B. *The different terminology of subsections (d)(1)(A) and (d)(9)(B)*

As is noted above, "medical care" is defined in subsection (d)(1)(A) by five terms—i.e., "diagnosis, cure, mitigation, treatment, or prevention". Some of these terms do have some overlapping shades of meaning, and it seems likely that when this "medical care" deduction was first enacted in 1942, Congress simply intended to enact a broad definition of medical care and therefore chose terms to convey that breadth, without particular intention about the potential distinctive meanings of those terms. The distinctive meanings would have been irrelevant under the general provision that allowed the deduction if *any* of these modes of care was provided. That is, if a medical procedure was a "treatment" but not a "mitigation", or was a "mitigation" but not a "treatment", the expense would be deductible nonetheless under section 213(d)(1)(A).

However, we consider here the very different and specific congressional intent 48 years later in 1990, when Congress enacted subsection (d)(9) to disallow deductions for cosmetic surgery. Congress provided an exception to this new disallowance, and allowed a deduction in the case of an otherwise cosmetic procedure, if it "*prevent*[*s*] *or treat*[*s*] illness or disease". Sec. 213(d)(9)(B) (emphasis added). According to this subsection, an otherwise cosmetic procedure will yield a deduction if it "prevent[s] or treat[s]" disease—i.e., two modes of care. Missing from this short list of deductible modes of care in subsection (d)(9)(B), as we have already noted, are three of the five terms in subsection (d)(1)(A), including "mitigation". The 1990 Congress was thus under-

do "treat" disease. But see the opinion of Judge Foley, interpreting the definition in subsection (d)(9)(B) to disallow deductions for appearance-improving procedures unless a procedure *both* "meaningfully promote[s] the proper function of the body" *and* "prevent[s] or treat[s]" disease. The majority does not undertake to demonstrate that SRS "meaningfully promote[s] the proper function of the body", and if the statute requires that both prongs be satisfied, then SRS must therefore be non-deductible. In this partial dissent, however, I assume arguendo that only one prong need be satisfied; and I show that even so, contrary to the majority's conclusion, SRS does not "prevent or treat" GID and therefore cannot be deductible even under the majority's one-prong analysis.

taking to provide a *limited* exception to its new disallowance, and in so doing it was selective in choosing from the vocabulary at hand. Under the wording Congress adopted, if an otherwise cosmetic procedure "mitigates" a disease but cannot be said to "treat" or "prevent" it, then under the plain terms of the statute, one would have to conclude that the expense of that procedure is non-deductible.

Congress provided that, to be deductible, an otherwise cosmetic procedure must "prevent or treat" a disease. Petitioner did not argue (and the majority does not hold) that SRS "prevents" GID (rather, SRS is offered only to persons who already suffer from the disorder, for whom "prevention" would come too late); so the contention must be that SRS "treats" GID.

### III. *The meaning of "treat" in section 213(d)(9)(B)*

The majority implicitly holds that "prevent or treat" in section 213(d)(9)(A) is equivalent to, or is shorthand for, "diagnos[e], cure, mitigat[e], treat[ ], or prevent[ ]" in subsection (d)(1)(A) and that no narrow meaning should be ascribed to "treat". Admittedly, it is possible to use the word "treat" in a loose manner that could include merely ameliorating the effects of a disease. In that loose sense, one could say that SRS "treats" GID by mitigating the unhappiness of the sufferer. "Treatment" and "mitigation" do appear side by side as modes of "care" in (d)(1)(A), reflecting different shades of meaning of the more general word "care"; and thus to some extent they are synonymous. If they were such close synonyms as to be equivalent in meaning (or if "treat" included "mitigate"[7]), then the absence of "mitigate" in (d)(9)(B) would not be significant. However, ascribing this broad or loose meaning to "treat * * * disease" is untenable under section 213, where "treat" must be distinguished from "mitigate", and where the direct object is "disease" (not "patient" or "symptom"), as I now show.

---

[7] By way of comparison, the absence of "cure" from section 213(d)(9)(B) is apparently not significant, because of the relationship of "treat" and "cure". "Treat" is a broader word that includes "cure". That is, although not everything that "treats" a disease undertakes to "cure" it, any procedure that does "cure" a disease necessarily "treats" it.

A. *To yield a deduction, an appearance-improving proce-
   dure must "treat" disease (as opposed to effecting
   "mitigation").*

Subsection (d)(9)(B) does not provide that appearance-
improving procedures are deductible if they "prevent, treat,
*or mitigate*" a disease, but rather if they "prevent or treat"
disease. The majority's leading definition of "treat", majority
op. p. 65, taken from Webster's New Universal Unabridged
Dictionary (2003), is "to deal with (a disease, patient, etc.) in
order to relieve or cure"; and the same dictionary's definition
of "mitigate" is—

1. to lessen in force or intensity, as wrath, grief, harshness, or pain; mod-
erate. 2. to make less severe * * *. 3. to make (a person, one's state of
mind, disposition, etc.) milder or more gentle; mollify; appease.

A usage note observes that the "central meaning [of "miti-
gate"] is 'to lessen' or 'make less severe'". Thus, the two
words "treat" and "mitigate" are by no means identical.

Consequently, a question directed toward "treatment" of a
disease may ask (using language from Webster's): Did the
procedure "deal with" the disease? Or it may ask (using lan-
guage from *Havey v. Commissioner*, 12 T.C. 409, 412 (1949)
(emphasis added)): "[D]id the treatment *bear directly on* the
* * * condition in question"? But a question about "mitiga-
tion" may ask (using language from Webster's): Did the
procedure "make [the disease] less severe" or "lessen * * *
pain"? And a comment that is framed in terms of "mitiga-
tion" may speak of "mitigation *of the effects* of his injury and
disability". *Pols v. Commissioner*, T.C. Memo. 1965–222, 24
T.C.M. (CCH) 1140 (1965) (emphasis added). Our Opinion in
*Starrett v. Commissioner*, 41 T.C. 877, 881 (1964), includes
such usage of both these terms. In *Starrett* we held that psy-
chiatric expenses were "clearly 'amounts paid for the diag-
nosis, cure, mitigation, treatment,' and 'prevention' of a spe-
cific 'disease'"; and we upheld the taxpayer's argument that
he underwent psychoanalysis—

for the diagnosis of his emotional condition, cure of a specific emotional
disease classified as anxiety reaction, *mitigation of the effects* upon him of
such disease, *treatment of the underlying causes* of his anxiety reaction,
and thereby the prevention of further suffering therefrom * * *. [*Id.*;
emphasis added.]

When "treat" and "mitigate" are distinguished, rather than being blended, "treatment" addresses underlying causes and "mitigation" lessens effects. I conclude that this distinction between "treat" and "mitigate" is critical to determining whether SRS "treats" GID, so as to render SRS expenses deductible.

B. *To yield a deduction, an appearance-improving procedure must treat "disease" (as opposed to treating a patient or a symptom).*

If the parties and the majority have in effect defined "treat" so broadly as to nearly encompass "mitigate", they may have done so by overlooking the fact that, in section 213(d)(9)(B), the object of the verb "treat" is "disease". The breadth of the dictionary definitions cited by the majority, majority op. p. 65, is attributable in part to the fact that one may "treat" a disease, *or* a patient, *or* a symptom. Consequently, a general definition of "treat" that is not confined—as section 213 is confined—to treatment *of a disease* should and will reflect shades of meaning appropriate for treatment *of symptoms*, which shades of meaning overlap more with "mitigate". For that reason these general dictionary definitions are not very illuminating in this instance, where the question is whether to "treat" *disease* is or is not the same as to "mitigate" *disease*.

As a part of "medical care", one could "treat" a *patient* with palliative care or could "treat" his painful *symptoms* with morphine (both of which could also be said to "mitigate", and the expenses of which would be deductible under section 213(a))—all the while leaving his disease un-"treated", strictly speaking. When Congress intends to enact a provision that turns on "treatment of *patients*"[8] or on "treatment of *symptoms*",[9] it knows how to do so; but it did not do so

---

[8] See sec. 168(i)(2)(C) (emphasis added); see also sec. 5214(a)(3)(D); 10 U.S.C. sec. 1077 (2006); 21 U.S.C. sec. 802 (2006); 22 U.S.C. sec. 2151b–3 (2006); 24 U.S.C. sec. 225g (2006); 38 U.S.C. secs. 1706, 1718, 7332 (2006); 42 U.S.C. secs. 238b, 256e, 280e, 280g–6, 280h–3, 290dd–2, 291o, 300d–41, 1320b–8 (2006).

[9] See 8 U.S.C. sec. 1611(b)(1)(C) (2006) (emphasis added); see also 8 U.S.C. secs. 1613, 1621, 1632 (2006); 42 U.S.C. secs. 285o–4(d), 300cc–3, 1395i–3, 1396r (2006). Focusing on treatment of symptoms, Judge Halpern emphasizes, Halpern op. p. 79 (emphasis added), that petitioner's expert pronounced petitioner "cured" (even though petitioner's belief about her sex was unchanged) in the sense that "the *symptoms* of the disorder were no longer present", e.g., "she had been free for a long time of clinically significant distress or impairment"; and Judge Halpern

Continued

in section 213(d)(9)(B), which allows deductions for procedures that "treat * * * *disease*". (Emphasis added.) If a procedure is said to "treat * * * *disease*", then "the treatment [will] bear directly on the * * * condition in question", *Havey v. Commissioner*, *supra* at 412, or will "deal with" the disease (as in Webster's). Other medical care may be "mitigation", but not "treatment".

In defining "cosmetic surgery", Congress aimed to deny deductions that had previously been allowed. If in the amended statute Congress had allowed deductions for appearance-improving procedures that "prevent, treat, *or mitigate*" a disease, then that broader exception might have undermined the intended limiting effect of the new disallowance. The majority's loose interpretation of subsection (d)(9)(B) treats the statute as if Congress had enacted that imaginary broader exception, and its loose interpretation invites arguments for the deduction not only of GID patients' SRS expenses but also of the cosmetic surgery expenses of any psychiatric patient who is (or claims to be) pathologically unhappy with his body. [10] In any event, Congress did *not* provide that an appearance-improving procedure will nonetheless be deductible if it merely "mitigates" a disease.

---

equates a removal of symptoms with a "cure" of the disease (and therefore a "treatment" of the disease), Halpern op. pp. 79–80. However, when treatment of *symptoms* makes a psychiatric patient content with his delusion, he has not been cured, and his "disease" has not been "treat[ed]" for purposes of section 213(d)(9)(B).

[10] See Diagnostic and Statistical Manual of Mental Disorders 576–582 (Body Dysmorphic Disorder (BDD)) (4th ed., text revision 2000) (DSM–IV–TR): "The essential feature of Body Dysmorphic Disorder (historically known as dysmorphophobia) is a preoccupation with a defect in appearance * * *. The defect is either imagined, or, if a slight physical anomaly is present, the individual's concern is markedly excessive * * *. The preoccupation must cause significant distress or impairment in social, occupational, or other important areas of functioning". The entry for BDD in DSM–IV–TR is not in the record; but the majority refers to "DSM–IV–TR, which all three experts agree is the primary diagnostic tool of American psychiatry", majority op. p. 60, and states that the U.S. Supreme Court has relied on a listing in the DSM in treating something as a "serious medical condition", majority op. note 40; and I take judicial notice of the BDD entry. See, e.g., *United States v. Long*, 562 F.3d 325, 334–335 & n.22 (5th Cir. 2009); *United States v. Johnson*, 979 F.2d 396, 401 (6th Cir. 1992). Whether BDD is a "disease" and whether cosmetic surgery purportedly prescribed for it could be "treat[ment]" under section 213(d)(9)(B) are questions yet to be litigated—if the majority's broad interpretation of section 213(d)(9)(B) prevails.

### C. *A looser interpretation of "treat \* \* \* disease" is not warranted in section 213(d)(9)(B).*

#### 1. *The structure of subsection (d)(9)(B) shows deliberate restriction in its terminology.*

Congress enacted section 213(d)(9) to restrict medical care deductions by explicitly denying such deductions for cosmetic surgery and similar procedures. Its terms must be understood by reference to that announced purpose. Consistent with that purpose, subsection (d)(9)(B) reflects, as I have shown, a narrowing of *both* prongs of the subsection (d)(1)(A) definition of "medical care"—i.e., subsection (d)(1)(A)'s "affect[ ] any structure or function of the body" was narrowed to become "meaningfully promote the proper function of the body" in (d)(9)(B); *and* subsection (d)(1)(A)'s "diagnosis, cure, mitigation, treatment, or prevention of disease" was narrowed to become "prevent or treat" disease in (d)(9)(B). Where Congress was explicitly setting out to shut down deductions for cosmetic surgery, the restricting language it employed can hardly be taken as careless or unintentional.

#### 2. *The stricter interpretation of subsection (d)(9)(B) is consistent with (d)(9)(A).*

Because the particular question in this case is whether SRS falls within the definition of cosmetic surgery for which expenses are *disallowed* in subsection (d)(9)*(B)*, the majority gives short shrift to subsection (d)(9)*(A)*. Subsection (d)(9)(A) shows the sorts of exceptional procedures for which Congress meant to *preserve* deductions—i.e., procedures that are "necessary to ameliorate a deformity arising from, or directly related to, a congenital abnormality, a personal injury resulting from an accident or trauma, or disfiguring disease"—and thus illuminates the congressional purpose. Someone like petitioner who suffers from GID has no deformities that are addressed by SRS; he has no "congenital abnormality"; he has suffered no "accident or trauma, or disfiguring disease." There is thus no indication that Congress explicitly intended to carve out, from its new disallowance, an exception that would reach SRS expenses. The wording choices in the statute that limit deductibility must be taken

at face value in order to vindicate the undisputed congressional purpose.

The majority not only ignores those implications of subsection (d)(9)(A) for the purpose of the statute but also renders much of (d)(9)(A) surplusage by its unduly loose interpretation of subsection (d)(9)(B). Subsection (d)(9)(A) provides that even if a procedure *is* "cosmetic surgery" (as defined in (d)(9)(B)), its expenses will be deductible if (inter alia) the procedure "ameliorate[s] a deformity arising from, or directly related to, * * * disfiguring disease." However, if surgical procedures that mitigate the effects of disease thereby fall outside the definition of "cosmetic surgery" (i.e., because they are deemed to "treat disease" in the broad sense), then subsection (d)(9)(A) would describe an empty set when it refers to "cosmetic surgery" that "ameliorate[s] a deformity arising from * * * disfiguring disease." If the procedure "ameliorate[s]", and if to ameliorate is to "treat", then the procedure would not be "cosmetic surgery" in the first place. Anything that "ameliorates" would be deductible because of the definition in (d)(9)(B), and the allowance in (d)(9)(A) would have no effect.

On the other hand, if "treat * * * disease" in subsection (d)(9)(B) is given its precise meaning (not excluding from "cosmetic surgery" a procedure that only mitigates the *effects* of disease), then (d)(9)(A) would operate to allow a deduction for cosmetic surgery that does not "treat" a disfiguring disease but rather ameliorates deformities arising from it. Thus, only the precise meaning of "treat disease" in (d)(9)(B) harmonizes with the allowance in (d)(9)(A).

### 3. *Broader usage of the word "treat" by doctors does not affect its significance in section 213(d)(9)(B).*

It appears that doctors sometimes use the word "treat" in this loose sense, so that they discuss SRS as a "treatment" for GID. See majority op. pt. III.D.1. However, as the majority indicates, majority op. p. 56, the meaning of statutory terms is within the judicial province, and we do not generally accept expert opinion on the meaning of statutory terms. In testimony in this case, doctors manifestly used the terms "care" and "treatment" almost interchangeably, without particular attention to whether it is the patient, the symptoms,

or the disease that is being addressed; in section 213(d), however, "care" is a general term of which "treatment" is a mode distinct from "mitigation", and deductible care is directed to "disease" (or "illness"), not to the patient or her symptoms. There is thus no indication that doctors' usage of these words respects the distinctions that are important in section 213.

With the foregoing understanding of the purpose and operation of section 213(d)(9), I now address the question whether SRS "treats" GID.

## IV. *SRS does not "treat" GID for purposes of section 213(d)(9)(B)*.

For the GID patient there is a dissonance between, on the one hand, his male body (i.e., his male facial appearance, his male body hair, his male body shape, his male genitalia, his male endocrinology, and the Y chromosomes in the cells of his body) and, on the other hand, his perception of himself as female. The male body conflicts with the female self-perception and produces extreme stress, anxiety, and unhappiness.

One could analyze the GID patient's problem in one of two ways: (1) His anatomical maleness is normative, and his perceived femaleness is the problem. Or (2) his perceived femaleness is normative, and his anatomical maleness is the problem. If one assumes option 2, then one could say that SRS *does* "treat" his GID by bringing his problematic male body into simulated conformity (as much as is possible) with his authentic female mind.

However, the medical consensus as described in the record of this case is in stark opposition to the latter characterization and can be reconciled only with option 1: Petitioner's male body was healthy, and his mind was disordered in its female self-perception. GID is in the jurisdiction of the *psychiatric* profession—the doctors of the mind—and is listed in that profession's definitive catalog of "*Mental* Disorders". See DSM–IV–TR at 576–582. When a patient presents with a healthy male body and a professed subjective sense of being female, the medical profession does not treat his body as an anomaly, as if it were infected by the disease of an alien maleness. Rather, his male body is taken as a given, and the patient becomes a *psychiatric* patient because of his dis-

ordered feeling that he is female. The majority concludes, majority op. p. 76 (emphasis added), that GID is a "serious *mental* disorder"—i.e., a disease in petitioner's mind—and I accept that conclusion.

A procedure that changes the patient's healthy male body (in fact, that disables his healthy male body) and leaves his mind unchanged (i.e., with the continuing misperception that he is female) has not treated his mental disease. On the contrary, that procedure has given up on the mental disease, has capitulated to the mental disease, has arguably even changed sides and joined forces with the mental disease. In any event, the procedure did not (in the words of *Havey v. Commissioner*, 12 T.C. at 412) "bear directly on the * * * condition in question", did not "deal with" the disease (per Webster's), did not "treat" the mental disease that the therapist diagnosed. Rather, the procedure changed only petitioner's healthy body and undertook to "mitigat[e]" the effects of the mental disease.

Even if SRS is medically indicated for the GID patient—even if SRS is the best that medicine can do for him—it is an otherwise cosmetic procedure that does not "treat" the mental disease. Sex reassignment surgery is therefore within "cosmetic surgery or other similar procedures" under section 213(d)(9)(A), and the expense that petitioner incurred for that surgery is not deductible under section 213(a).

WELLS, FOLEY, VASQUEZ, and KROUPA, *JJ*., agree with this concurring in part and dissenting in part opinion.